[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 4, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-13810

_____

D. C. Docket No. 02-00408-CV-4-WS

FLORIDA PUBLIC INTEREST RESEARCH GROUP
CITIZEN LOBBY, INC.,
SAVE OUR SUWANNEE, INC., et al.,

                                        Plaintiffs-Appellants,

versus

ENVIRONMENTAL PROTECTION AGENCY,
MIKE LEAVITT, Administrator, et al.,

                                        Defendants-Appellees,

FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

                                        Intervenor-Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(OCTOBER 4, 2004)

Before BIRCH, MARCUS and BRUNETTI[*], Circuit Judges.

MARCUS, Circuit Judge:

The plaintiffs[1] appeal from the district court's order granting summary judgment in favor of the defendants, the United States Environmental Protection Agency and its administrators (collectively, "the EPA"), and the Florida Department of Environmental Protection ("the FDEP"). After thorough review of the record and careful consideration of the briefs and oral argument, we conclude that this case is justiciable and that unresolved factual issues remain. Accordingly, we vacate and remand for further proceedings consistent with this opinion.

I.

A.

Two basic issues are raised on appeal: first, whether the case is justiciable, both because the plaintiffs have standing to challenge the EPA's failure to review a state administrative rule affecting Florida's water quality standards, and because the controversy remains alive; and second, whether the Florida Department of

_____

[*] Honorable Melvin Brunetti, United States Circuit Judge for the Ninth Circuit, sitting by designation, participated in the oral argument of this case. Judge Brunetti, however, did not participate in the disposition of this case, which we decide by quorum. 28 U.S.C. § 46(d).

[1] The plaintiffs are The Florida Public Interest Research Group Citizen Lobby, Inc. ("FPIRG"), Save Our Suwanee, Inc. ("SOS"), Friends of Saint Sebastian River, an unincorporated association ("FSSR"), the Sierra Club, Inc. ("Sierra Club"), and Linda Young, a Florida resident, outdoor water-sports enthusiast, and employee of the Clean Water Network.

Environmental Protection, by establishing a new rule, changed or added to the state's existing water quality standards. Inasmuch as a clear understanding of how the federal and state governments share responsibilities to regulate water pollution is essential to the resolution of this case, we set forth in some detail the relevant facts and the overall regulatory and statutory scheme embodied in the Clean Water Act.

Since 1972, the federal and state governments have worked together to restore and maintain the integrity of the nation's waters, in a partnership governed by the Federal Water Pollution Control Act, commonly known as the Clean Water Act, 86 Stat. 816 (codified as amended at 33 U.S.C. § 1251 et seq.) ("Clean Water Act"). See Arkansas v. Oklahoma, 503 U.S. 91, 101, 112 S. Ct. 1046, 1054, 117 L. Ed. 2d 239 (1992) (describing partnership). Many duties to monitor and regulate pollution of the nation's waters are divided between the federal and state governments.

Among other things, state governments are responsible for establishing water quality standards for all of their waterbodies. Water quality standards are designed to do two things: first, they designate the use or uses to be made of the water, such as fishing or swimming; and, second, they set the basic criteria that must be satisfied in order to safely permit those uses. 40 C.F.R. § 131.2. The

3

second aspect of water quality standards, the water quality criteria, can be expressed in narrative form or in a numeric form, e.g. specific pollutant concentrations. Id. at § 131.3(b). We have described the second aspect of a water quality standard as setting the "level of water quality needed to safely allow[ the waterbody's designated] use." Sierra Club v. Meiburg, 296 F.3d 1021, 1025 (11th Cir. 2002) This level may be described as "constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 C.F.R. § 131.3(b).

While states are primarily responsible for establishing these water quality standards, the EPA, in turn, is required to undertake a review of any new or revised water quality standards adopted by the states. 33 U.S.C. § 1313(c)(2)(A). Among other things, this review involves a determination of the following:

> Whether the state has adopted criteria that protect the designated water uses; [w]hether the State has followed its legal procedures for revising or adopting standards; [and w]hether the State standards which do not include the uses specified in section 101(a)(2) of the Act are based upon appropriate technical and scientific data and analyses . . . .

40 C.F.R. § 131.5. Moreover, under the Clean Water Act, the state's water quality standards may only be revised if the change complies with the anti-degradation policy which EPA regulations mandate each state to adopt. 33 U.S.C. §

4

1313(d)(4)(B); see 40 C.F.R. § 131.12.  Thus, any change must, at the very least, maintain the existing quality of each waterbody, preventing any further "degradation" of the waterbody's integrity.  PUD No. 1 of Jefferson County and City of Tacoma v. Wash. Dep't of Ecology, 511 U.S. 700, 704, 114 S. Ct. 1900, 1905-06, 128 L. Ed. 2d 716 (1994) (citing 33 U.S.C. § 1313(d)(4)(B)).

If the state's new or revised standards meet the requirements of the Clean Water Act, the EPA must approve the standards within sixty days.  33 U.S.C. § 1313(c)(3); see also Arkansas, 503 U.S. at 101, 112 S. Ct. at 1054.  If, however, the EPA identifies violations of the Clean Water Act, the EPA is required to take appropriate measures to ensure that these problems are fixed.  In fact, it must notify the state within ninety days and specify the changes needed to comply with the Clean Water Act.  33 U.S.C. § 1313(c)(3).  The EPA also must propose new regulations that satisfy the requirements of the Clean Water Act.  Id. at § 1313(c)(4).  And if the state does not adopt EPA's proposed changes within ninety days of publication, the EPA itself must promulgate those standards.  Id.  Any existing water quality standard "remains the applicable standard until [the] EPA approves a change, deletion, or addition to that water quality standard, or until [the] EPA promulgates a more stringent water quality standard."  40 C.F.R. § 131.21(e).

5

Water quality standards play an important role in maintaining and improving the cleanliness and safety of the nation's waterbodies, because they are designed to determine which waterbodies are safe enough to support their designated uses. Thus, each state must compile a list identifying those bodies of water that are impaired, i.e. not safe enough to use as designated. 33 U.S.C. § 1313(d)(1)(A). This list (known as the "Impaired Waters List" or "303(d) list") is then sent to the EPA for approval. Id. at §§ 1313(d)(1)(A), (d)(2). If the EPA disapproves of the state's proposed Impaired Waters List, it must issue its own list. Meiburg, 296 F.3d at 1025-26 (citing 33 U.S.C. § 1313(d)(2)).

When a waterbody does not satisfy a water quality standard, both the state and the federal government are required to act to control and remedy the pollution of the waterbody. See Meiburg, 296 F.3d at 1025. The state and federal governments are directed to adjust the amounts of pollution that are permitted by individual, identifiable sources, and to implement more generalized programs to reduce the amount of pollution.[2] Id. at 1025-26 (citing 33 U.S.C. §§

---

[2] The state prepares a management program identifying "best management practices and measures" to reduce pollution, which, in turn, the EPA must approve and may provide grants to implement. Meiburg, 296 F.3d at 1026. Moreover, the state prepares a "continuing planning process" which "is essentially a plan for how the state is going to clean up pollution." Id. (quoting 33 U.S.C. § 1313(e)(1)). The EPA is then required to approve or disapprove the continuing planning process and, after approval, to occasionally determine its consistency with the Clean Water Act. Id. (citing 33 U.S.C. § 1313(e)(2)).

1313(e)(1),(2); 1329(b), (h)).  However, this important clean-up process does not begin unless and until the waterbody is identified on the Impaired Waters List.

The Florida Department of Environmental Protection created Florida's water quality standards when it promulgated chapter 62-302 of the Florida Administrative Code, setting forth the state's "Surface Water Quality Standards" ("Florida's Surface Water Quality Standards").  See Fla. Admin. Code Ann. r. 62-302.200-.800.  The Florida State Legislature instructed the FDEP to adopt a methodology to identify impaired waters, taking into account "the variability occurring in nature" and recognizing "the statistical variability inherent in sampling and testing procedures that are used to express water quality standards." Fla. Stat. § 403.021(11).

Two sentences found in Florida's Surface Water Quality Standards are relevant to this case.  First, the state regulation, in providing the maximum levels of pollutants that each waterbody may contain without becoming unsafe for use, explains that "[u]nless otherwise stated, all criteria express the maximum not to be exceeded at any time."  Fla. Admin. Code Ann. r. 62-302.530.  Second, in setting out the nutrient levels that waterbodies could safely contain, the regulation says that "[i]n no case shall nutrient concentrations of a body of water be altered so as

7

to cause an imbalance in natural populations of aquatic flora or fauna." Id. (emphasis added).

The present dispute arose when, on April 26, 2001, the FDEP adopted chapter 62-303 of the Florida Administrative Code, the so-called "Impaired Waters Rule."[3]  Fla. Admin. Code Ann. r. 62-303.100-.700.  The stated purpose of the Impaired Waters Rule was to "interpret existing water quality criteria and evaluate attainment of established designated uses."  Fla. Admin. Code Ann. r. 62-303.100(3).  The Impaired Waters Rule provided that "[i]t is not the intent of this chapter to establish new water quality criteria or standards, or to determine the applicability of existing criteria under other provisions of Florida law."  Id.

Despite this language, the plaintiffs contend, the Impaired Waters Rule has effectively changed Florida's water quality standards.  First, they say, while the original water quality standards required their criteria "not to be exceeded at any

---

[3] The Impaired Waters Rule became effective on June 10, 2002.  The FDEP's promulgation of the Impaired Waters Rule was authorized by the Florida Legislature, through the enactment in 1999 of the Florida Watershed Restoration Act, codified at Fla. Stat. § 403.067.  This act directed the FDEP to develop and "adopt by rule a methodology for determining those waters which are impaired" and which, therefore, must be included on the Impaired Waters List.  Fla. Stat. § 403.067(3)(b).  The Florida State Legislature's action was in response to a consent decree approved by the United States District Court for the Northern District of Florida in Florida Wildlife Federation, Inc. v. Browner, No. 4:98CV356-WS (N.D. Fla. Aug. 7, 1999).  In that case, several environmental groups sought to compel the EPA to establish maximum levels of allowable pollutants for waters on Florida's 1998 Impaired Waters List.  Under the consent decree, if the state failed to establish these maximums for waters on Florida's 1998 Impaired Waters List, the EPA was required to do so.

time," the Impaired Waters Rule allows multiple exceedances to occur without triggering classification of a waterbody as impaired. In practical effect, the plaintiffs argue, this results in a more forgiving, looser water quality standard, since the Impaired Waters Rule requires more than a single sample taken from a waterbody to exceed the maximum concentration of pollutants before that waterbody is deemed impaired,[4] Fla. Admin. Code. Ann. r. 62-303.320, .340, .430, while a single exceedance would have sufficed under the pre-existing standards.

Second, the plaintiffs allege, the Impaired Waters Rule changes or adds to the narrative nutrient standard provided by Florida's Surface Water Quality Standards. Florida's narrative nutrient standards provides that "in no case shall nutrient concentration of a body of water be altered so as to cause an imbalance in natural populations of aquatic flora and fauna." Fla. Admin. Code. Ann. r. 62-302.530(48)(b). The Impaired Waters Rule adopts specific nutrient concentrations to be used as the primary means for assessing nutrient impairment; these means

_____

[4]Based on binomial statistical methodology, the Impaired Waters Rule provides a chart setting how many exceedances must be found in a sample set to be an accurate measure of the total waterbody's quality. Fla. Admin. Code. Ann. r. 62-303.320. Separate from this chart, the Impaired Waters Rule mandates that two samples exceeding the maximum concentration for toxic pollutants must be found before placing a waterbody on the Impaired Waters List. Fla. Admin. Code. Ann. r. 62-303.340. Also distinct from the general chart of minimum sample sizes, the Impaired Waters Rule requires that a waterbody have a minimum of two failed bioassessments -- not just one -- before being placed on the Impaired Waters List. Fla. Admin. Code. Ann. r. 62-303.430.

are not included in the pre-existing, approved water quality standards. In addition, the Impaired Waters Rule provides specific numeric criteria for nutrient concentrations which do not exist within Florida's Surface Water Quality Standards. Thus, the plaintiffs contend, the Impaired Waters Rule has the effect of modifying the existing water quality standards.[5]

---

[5] The relevant Impaired Waters Rule provisions are these:

(1) Trophic state indices (TSIs) and annual mean chlorophyll a values shall be the primary means for assessing whether a water should be assessed further for nutrient impairment. Other information indicating an imbalance in flora or fauna due to nutrient enrichment, including, but not limited to, algal blooms, excessive macrophyte growth, decrease in the distribution (either in density or areal coverage) of seagrasses or other submerged aquatic vegetation, changes in algal species richness, and excessive diel oxygen swings, shall also be considered.

(2) To be used to determine whether a water should be assessed further for nutrient enrichment,
(a) Data must meet the requirements of subsections (2), (4), (6), and (7) in rule 62-303.320, F.A.C.
(b) At least one sample from each season shall be required in any given year to calculate a Trophic State Index (TSI) or an annual mean chlorophyll a value for that year, and
(c) There must be annual means from at least four years when evaluating the change in TSI over time pursuant to subsection 62-303.352(3), F.A.C.
(3) When comparing changes in chlorophyll a or TSI values to historical levels, historical levels shall be based on the lowest five-year average for the period of record. To calculate a five-year average, there must be annual means from at least three years of the five-year period.

Fla. Admin. Code Ann. r. 62-303.350.

Nutrients in Streams. A stream or stream segment shall be included on the planning list for nutrients if the following biological imbalances are observed:
(1) Algal mats are present in sufficient quantities to pose a nuisance or hinder reproduction of a threatened or endangered species, or
(2) Annual mean chlorophyll a concentrations are greater than 20 ug/l or if data

10

The EPA provided substantial guidance to the Florida Department of

Environmental Protection during the early drafting of the Impaired Waters Rule.

Indeed, it even pointed out that the Impaired Waters Rule appeared to make

several revisions to Florida's Surface Water Quality Standards.[6]  Notably,

---

> indicate annual mean chlorophyll a values have increased by more than 50% over
> historical values for at least two consecutive years.

Fla. Admin. Code Ann. r. 62-303.351.

> Nutrients in Estuaries.  Estuaries or estuary segments shall be included on the
> planning list for nutrients if their annual mean chlorophyll a for any year is greater
> than 11 ug/l or if data indicate annual mean chlorophyll a values have increased by
> more than 50% over historical values for at least two consecutive years.

Fla. Admin. Code. Ann. r. 62-303.353.

[6] During an initial review of an early draft of the Impaired Waters Rule, the EPA noted that "[a]lthough ultimately it may not be a problem, a number of the provisions in the draft rule are likely to be considered to be revisions to the State's water quality standards, and as such, will require review and approval by [the] EPA."  Letter from Beverly H. Banister, Acting Director of EPA's Water Management Division, to Jerry Brooks, Assistant Director of FDEP's Division of Water Facilities of 9/5/2000, at 2.

The letter elaborated that the "most troubling aspect of the State's draft rule are the numerous provisions that would allow the State to remove from their current section 303(d) list [of impaired waters] many waters for what the State defines as insufficient data or for other reasons."  Id.  The EPA's position at this time was that "these provisions are inconsistent with the CWA and regulations, and would lead to EPA's disapproval of the a [sic] section 303(d) list that was based on this methodology."  Id.  Mainly, the EPA was concerned with apparent revisions to the "not to be exceeded" requirement of Florida's Surface Water Quality Standards. Resolution of Comments by the USEPA on the Florida Draft Rule, at 4 (summarizing earlier EPA comment letters of 9/5/2000 and 9/22/2000).  Specifically, the EPA pointed out the Impaired Waters Rule's use of the minimum sample sizes and exclusions of data collected during certain events or periods.  Id.

The EPA also noted the potential revision contained in sections 62-303.340 and 62-303.440, which required the examination of two samples indicating toxicity before a water was classified as impaired.  The EPA found that "these provisions appear to modify the State's

11

however, the EPA did not conduct an official, thorough review and approval of

the final version of the Impaired Waters Rule, as was required under the Clean

---

narrative [water quality standards] criteria for toxicity, and as such, would be revisions [to] the State's water quality standards requiring EPA's review and approval." Detailed Comments on the Florida Draft Rule, at 5. The EPA's stated view was that"[i]t would be appropriate to conduct a second toxicity test to verify the toxicity determination, but in the absence of such a second sampling, the water must be considered impaired." Id. at 6.

Likewise, the EPA objected to the rule requiring two, rather than one, failed bioassessment before a waterbody is deemed impaired. Id. at 5. The EPA's stated position was that "[o]ne biological sampling should be sufficient unless one is unsure of the result and then one should resample relatively quickly." Id. The EPA concluded that the provisions providing biological methods "appear to modify the State's narrative . . . criteria for biological health, and as such, would be a revision to the State's water quality standards requiring EPA review and approval." Id.

In addition to the apparent change to the "not to be exceeded at any time" provision of Florida's water quality standards, the EPA found in its early reviews that portions of the proposed Impaired Waters Rule "appear to establish an implementation methodology for the State's narrative criteria for nutrients, and, as such, appear to be revisions to Florida's [water quality standards] requiring [the] EPA's review and approval." Id. at 6. After the FDEP made several revisions to the IWR, the EPA modified its view of the Impaired Waters Rule. The EPA explained in a letter to the FDEP that it believed "the [Impaired Waters Rule], as it is now drafted, has resolved almost all of [the] EPA's earlier concerns." Letter from Banister to Brooks of 4/26/2001, at 1. For example, the EPA's prior questions about the requirement of two exceedances for toxic pollutants were answered to the EPA's satisfaction, by the Impaired Waters Rule's new requirement that the FDEP collect a second sample testing for toxic pollutants when only one sample was available. Resolution of Comments by the USEPA on the Florida Draft Rule, at 8. The EPA's concern that certain provisions of the Impaired Waters Rule could be viewed as a change to Florida's water quality standards was assuaged by the regulation's clarification that "the [Impaired Waters Rule] expresses how the State implements its [water quality standards] for Section 303(d) listing purposes only, and does not change any existing [water quality standards]." Letter from Banister to Brooks of 4/26/2001, at 3.

However, in spite of this caveat, the provisions initially questioned by the EPA were left largely unchanged in substantive terms. Although the revised Impaired Waters Rule stated that it only provided a methodology for assessing compliance with existing standards, those provisions the EPA had initially concluded would be viewed as revisions to the existing standards were left largely the same.

12

Water Act <u>if</u>, in fact, the Impaired Waters Rule created <u>new</u> or <u>revised</u> water quality standards.  33 U.S.C. § 1313(c)(3).

On August 28, 2002, the Florida Department of Environmental Protection first updated its Impaired Waters List by applying the Impaired Waters Rule.  This update used the Impaired Waters Rule to re-examine about twenty percent of Florida's waterbodies.[7]  On October 1, 2002, Florida submitted its Group One Update to the 1998 Impaired Waters List ("Group One Update") to the EPA for review as required by the Clean Water Act.[8]  <u>See</u> 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d).

In accordance with  EPA regulations, <u>see</u> 40 C.F.R. § 130.7(d), the EPA reviewed the Group One Update to Florida's Impaired Waters List and published the results of its review on June 11, 2003.[9]  The EPA explained in its Decision Document that, because parts of the Impaired Waters Rule had "not been used before and [were] not part of the State's water quality standards," the EPA would

---

[7] Because Florida has so many waterbodies, the FDEP divided the fifty-two water basins of the state into five distinct basin groups, with each group representing approximately 20% of the State's waters.  The update conducted in 2002 ("Group One Update") only examined data for the 1600 waterbodies in the first group.

[8] Florida later amended the list on May 12, 2003.

[9] At the time when the district court entered final summary judgment, on May 29, 2003, the results of the EPA's review had not yet been released.

first determine whether application of the Impaired Waters Rule was a "reasonable" approach to identifying impaired waters. Region 4, Water Management Division, EPA, Decision Document Regarding Department of Environmental Protection's §303(d) List Amendment Submitted on October 1, 2002 and Subsequently Amended on May 12, 2003 at 12 (June 11, 2003) ("EPA Decision Document").

In this review, the EPA did not make a threshold determination whether the Impaired Waters Rule complied with the requirements of the Clean Water Act, including its anti-degradation policy. Rather, it first subjected each methodology adopted by the State to a more general "reasonableness" review. When it concluded that a particular methodology was reasonable, the EPA approved without further review all waterbodies placed on the Impaired Waters List under that methodology -- but, notably, the EPA did not re-examine the data for waterbodies that were delisted because of the change in methodology.[10] EPA

---

[10] Thus, for example, the EPA's final position on the added numeric criteria for nutrient concentrations was that the Impaired Waters Rule's use of chlorophyll a levels and use of TSI to determine attainment of water quality standards for nutrients was a reasonable method of applying the State's approved narrative water quality standard for nutrients. EPA Decision Document at 34-35. The EPA did not specifically address whether the numeric criteria were revised or new criteria, although it concluded that "the narrative criteria application set out in Florida's listing methodology is consistent with Florida's approved water quality standard for nutrients." Id. at 35. It therefore approved without further review all of the FDEP's listing decisions for nutrients in lakes based on that methodology. Id. Similarly, the EPA found the FDEP's exclusion of data older than 7.5 years to be "reasonable," and accordingly adopted the

14

Decision Document at 34-35. Where the EPA had doubts about an Impaired

Waters Rule methodology, such as the exclusion of waterbodies that did not meet

the sample size and other data requirements, the EPA examined the data of a

random sample of the delisted waterbodies to determine whether the methodology

failed to reasonably identify impaired waters. EPA Decision Document at 24. If

the random sample seemed to establish the reasonableness of a methodology, the

EPA did not further review whether the methodology accurately identified all

impaired waters in that category.[11] In still other cases, the EPA looked more

closely at individual sample data and added waterbodies to the Impaired Waters

List based on its independent review.[12] Id. at 27, 37.

_____

same time frame in its own review. Id. at 23.

[11] The EPA had concerns about the data excluded by the FDEP. In accordance with the Impaired Waters Rule, waterbodies that did not meet the data sufficiency requirements of the regulation were not included on the State's Impaired Waters List. EPA Decision Document at 24. The FDEP thus included the waterbody on either a list of waterbodies with insufficient data for assessment, called Category 3b, or the list of waterbodies that are potentially impaired, called Category 3c. Id. The EPA found that the Impaired Waters Rule contradicted an EPA regulation which required each state to "assemble and evaluate all existing and readily available water quality-related data and information to develop the list required by §§ 130.7(b)(1) and 130.7(b)(2)." Id. (quoting 40 C.F.R. § 130.7(b)(5) (emphasis added)). To determine whether the Impaired Waters Rule overly restricted data analysis and, therefore, failed to identify limited segments, the EPA reviewed a random sample of waterbodies listed in Category 3b. Id. Based on its review, the EPA determined that the data guidelines used by the FDEP "did not result in the failure to identify any water quality limited segments." Id.

[12] The EPA looked closely at the data for each waterbody included in Category 3c, which were the waters that did not meet the data sufficiency requirements of the Impaired Waters Rule. As a result, the EPA added some waterbodies onto the Impaired Waters List. Id. at 27, 37. While accounting for variability inherent in nature and in sampling and testing procedures, the

15

In no case did the EPA require Florida to change its Impaired Waters Rule. Even where it disagreed entirely with a methodology of the new set of regulations, the EPA simply conducted its own independent review of waterbodies, repeating rather than simply reviewing the work that Florida was required to do.[13]  In its Group One Update, the Florida Department of Environmental Protection removed

---

EPA reviewed data for trends, levels during critical conditions, and other more site specific data considerations such as waterbody type. Id. at 37.

[13]  In one case, the EPA completely rejected one provision of the Impaired Waters Rule and added all waterbodies delisted based on that provision.  EPA Decision Document at 27.  The statute authorizing the FDEP to develop the Impaired Waters Rule did not permit the FDEP to add any waterbodies to the Impaired Waters List unless the FDEP identified the pollutant causing the impairment.  Fla. Stat. § 403.067(4).  The EPA's position was that Section 303(d) of the Clean Water Act required states to list waterbodies that are impaired even when the specific pollutant was unknown, unless the state could demonstrate that non-pollutant stressors cause the impairment.  EPA Decision Document at 27.   As a result, the EPA added all waterbodies which had been identified by Florida as impaired but were delisted because the pollutant was not known.  Id.

However, in most cases, the EPA simply conducted an independent review of the waterbodies affected by a new methodology rejected by the EPA.  Thus, for example, the EPA disapproved of the Impaired Waters Rule's requirement of at least two samples demonstrating exceedances of toxic pollutants.  It noted that concentrations of  toxic and non-conventional pollutants generally do not vary widely under natural conditions, so that one sample showing an exceedance probably meant the entire waterbody was over-polluted.  Id. at 29.  Therefore, the EPA looked carefully at waterbodies with data related to toxic and non-conventional pollutants, and added two waterbodies that the FDEP had failed to include on their Impaired Waters List. However, the EPA did not require Florida to change its policy in future updates.   Likewise, the EPA took the position that, in some circumstances, a single recent bioassessment could provide enough evidence that a waterbody is impaired.  Id. at 31.  Rather than requiring Florida to change the Impaired Waters Rule, the EPA itself independently reviewed the data for affected waterbodies to determine if there were any waterbodies which should have been listed based on existing bioassessment data.  Id. at 31-32.  As a result of its investigation, the EPA added one waterbody to the Impaired Waters List that the FDEP had not included in their submission to the EPA.

16

more than one hundred waterbodies from the Impaired Waters List.  After review

of the Group One Update, the EPA disagreed with many of these delistings, and

added waterbodies back to the Impaired Waters List.  Federal Appellees' Br. at 2.

However, even after the EPA's review of the Group One Update, over one

hundred waterbodies that had previously been considered impaired were now

removed from the Impaired Waters List and were no longer subject to the

procedures used to clean up impaired waters.[14]

## B.

After the effective date of the Impaired Waters Rule, but prior to the EPA's

release of its review of the Group One Update, the plaintiffs brought this suit

against the EPA under the citizen suit provision of the Clean Water Act, to enforce

the unambiguous requirement that the EPA review any new or revised water

quality standards for compliance with the Act.  See 33 U.S.C. § 1365(a)(2).  Under

this provision, citizens may sue the EPA and its administrators for failing "to

perform any act or duty under [the Act] which is not discretionary with the

---

[14] During oral argument, the plaintiffs said that after the EPA re-listed eighty-two waterbodies, there still were one hundred sixty-one waterbodies delisted, but they did not cite to anything contained in the record to support this assertion.  The EPA Decision Document suggested that a different number of waterbodies were left delisted.  This is an issue of fact that may be resolved in the district court upon remand, but for the purpose of this appeal, it is sufficient for us to observe that over one hundred waterbodies were delisted by Florida which the EPA did not put back on the Impaired Waters List.

Administrator." Id. The EPA's obligation to review any new or revised state water quality standards is one such mandatory duty. Miccosukee Tribe of Indians of Fla. v. United States, 105 F.3d 599, 602 (11th Cir. 1997). The plaintiffs claimed that the effect of the Impaired Waters Rule was to revise Florida's Surface Water Quality Standards, and, therefore, that the Impaired Waters Rule was subject to nondiscretionary review by the EPA.[15] 33 U.S.C. § 1313(c); 40 C.F.R. § 131.5.

The FDEP moved to intervene as a defendant and the district court granted their application. In time, the plaintiffs, the EPA, and the FDEP all filed cross-

---

[15] In the alternative, the plaintiffs argued that the Impaired Waters Rule is a policy that implemented Florida's Surface Water Quality Standards, which the EPA is required to approve or disapprove, see 40 C.F.R. § 131.13, and that the EPA unlawfully withheld or unreasonably delayed that action in violation of the Administrative Procedure Act. See 5 U.S.C. § 706(1). The APA gives the federal district courts the power to compel such agency action, provided that "there is no other adequate remedy in a court." 5 U.S.C. § 704. In this case, the district court concluded that it lacked subject matter jurisdiction to review the APA claim, for the same reasons it rejected the Clean Water Act citizen suit claim. The plaintiffs argue on appeal that, even if the district court was correct in concluding that the EPA was not required to review the Impaired Waters Rule, under 33 U.S.C. § 1313(c), thus barring a citizen suit under 33 U.S.C. § 1965, the EPA still unlawfully withheld or unreasonably delayed its action to approve policies that implement a state's water quality standards, which the APA forbids. However, section 131.13 merely states that states may establish "policies generally affecting their application and implementation," which are "subject to EPA review and approval." 40 C.F.R. § 131.13. This language does not create a mandatory duty subject to APA regulation, and "the only agency action that can be compelled under the APA is action legally required." Norton v. Southern Utah Wilderness Alliance, __ U.S. __, 124 S. Ct. 2373, 2379 & n. 1, 159 L. Ed. 137 (2004). Of course, if the Impaired Waters Rule created new or revised water quality standards, then the EPA plainly would have a mandatory duty to review the regulation, but in that case, the plaintiffs would then have a valid claim under the citizen suit provision of the Clean Water Act, and thus would have another "adequate remedy in court" which, in any event, would bar its APA claim.

motions for summary judgment. On May 29, 2003, the district court granted

summary judgment to the EPA. Florida Public Interest Research Group Citizen

Lobby, Inc. v. EPA, No. 4:02cv00408, slip. op. at 12 (N.D. Fla. May 29, 2003)

("Opinion"). The district court explained its reasoning this way:

> To modify or amend Florida's water quality standards, FDEP must comply with the rule-making procedures set forth in Florida's Administrative Procedure Act. Fla. Stat. ch. 120.54. FDEP has engaged in no such rule-making process to modify or amend Florida's water quality standards, and the EPA has approved no modifications or amendments to [Florida's Surface Water Quality Standards.] As a matter of law, therefore, the water quality standards set forth in chapter 62-302 remain the water quality standards for the State of Florida notwithstanding FDEP's adoption of the [Impaired Waters Rule].
>
> By its own terms, the [Impaired Waters Rule] was and is intended to provide a methodology for identifying bodies of water that are not attaining the State of Florida's approved water quality standards and that, therefore, must be included on the State's [Impaired Waters List]. Under the CWA, the EPA must review and approve Florida's [Impaired Waters List] before it becomes the applicable [Impaired Waters List] for purposes of the CWA . . . . If Florida's listing methodology has resulted in an [Impaired Waters List] which is inconsistent with the state's existing, EPA-approved water quality standards codified in chapter 62-302, the EPA would be required to disapprove the list, in whole or in part, and make its own listing decisions as appropriate. 40 C.F.R. § 130.7(d)(2). The listing methodology set forth in the [Impaired Waters Rule], in other words, cannot possibly have the effect of revising Florida's water quality standards or policies affecting those standards, provided that the EPA complies -- as it must -- with the requirements of the CWA.

19

In sum, the EPA and the FDEP persuasively argue, and this court finds, that the State of Florida, through the [Impaired Waters Rule], has neither formally, nor in effect, established new or modified existing water quality standards or policies generally affecting those water quality standards.

Opinion at 12-13 (emphasis added).

The district court thus relied heavily on three major conclusions: (1) the FDEP had not followed the proper procedures to amend Florida's water quality stadards; (2) the EPA had not formally approved any amendments to Florida's water quality standards; and (3) the EPA's subsequent review of the final list of impaired waters meant that the Impaired Waters Rule could not have the effect of revising Florida's water quality standards. The district court, therefore, concluded that the EPA had no nondiscretionary duty to review the Impaired Waters Rule, and accordingly, that the court lacked jurisdiction to compel the EPA to review the Rule, under the provisions of either Title 33 U.S.C. § 1313 or 40 C.F.R. § 131.13. It then granted final summary judgment to the defendants.

On appeal, the plaintiffs argue that the district court erred by failing to specifically determine the effect of the Impaired Waters Rule on Florida's Surface Water Quality Standards. Had the district court done so, the plaintiffs say, it would have concluded that the effect of the Impaired Waters Rule was actually to revise Florida's "not to be exceeded at any time" standard and Florida's narrative

nutrient standard. The plaintiffs urge this Court to declare that as a matter of law the Impaired Waters Rule is either a revision to Florida's water quality standards, or, in the alternative, to remand the case to the district court to determine the effect of the Impaired Waters Rule on Florida's water quality standards.

The state appellee, the Florida Department of Environmental Protection, responds that the district court properly concluded the Impaired Waters Rule could have no effect on Florida's Surface Water Quality Standards. Moreover, even if the district court had looked more closely at the Impaired Waters Rule, the FDEP claims, it would have found that the Impaired Waters Rule simply clarified (and did not change) existing water quality standards. The federal appellee, the EPA, argues alternatively that we should affirm because the case is not justiciable: first, because the plaintiffs do not have standing to bring this suit; and second, because the EPA's subsequent independent review of the Group One Update rendered moot any claim resulting from the EPA's failure to review the Impaired Waters Rule.

## II.

After thorough review, we conclude that (1) the plaintiffs have standing; (2) their claim has not been mooted by the EPA's review of the Impaired Waters List; and (3) the district court erred in determining as a matter of law that the Impaired

21

Waters Rule did not establish new or revised water quality standards. The district court should not have relied on the FDEP's failure to follow its own procedures to amend the water quality standards, nor on the EPA's subsequent review of the Impaired Waters List. Rather, the district court was required to determine how Florida's Surface Water Quality Standards had previously been applied, and whether the Impaired Waters Rule, as applied, actually changed the water quality standards. Accordingly, we vacate the entry of final summary judgment, and remand for further proceedings to determine what effect, if any, the Impaired Waters Rule had on Florida's water quality standards.

A.

We review questions of standing and mootness de novo. See London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1251 (11th Cir. 2003); 31 Foster Children v. Bush, 329 F.3d 1255, 1263 (11th Cir. 2003). An order of summary judgment is also subject to de novo review; we apply the same legal standards that bound the district court. See, e.g., Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co., 320 F.3d 1260, 1267 (11th Cir. 2003). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56 (c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968)). In making this assessment, we "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir.1997), and "resolve all reasonable doubts about the facts in favor of the non-movant." United of Omaha Life Ins. v. Sun Life Ins. Co., 894 F.2d 1555, 1558 (11th Cir.1990); see also Wooden v. Bd. of Regents of the Univ. Sys. of Ga., 247 F.3d 1262, 1271 n. 9 (11th Cir. 2001) (citing Rosen v. Bezner, 996 F.2d 1527, 1530 n.2 (3d Cir. 1993) ("[B]ecause summary judgment may only be granted where there is no genuine issue of material fact, any purported 'factual findings' of the trial court cannot be 'factual findings' . . . but rather are conclusions as a matter of law . . . .")).

## B.

Before addressing the plaintiffs' substantive arguments, we are required to answer whether this case is justiciable. First, the EPA suggests that the plaintiffs

23

have not met the basic requirements of standing.  Although the district court did not rely on standing, the EPA says that the lack of standing affords an alternative basis to affirm the dismissal.

It is surely true that "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines."  Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 807 n.9 (11th Cir. 1993) (citations and quotation marks omitted).  It is also by now well established that to have standing, and therefore a justiciable "case or controversy," the plaintiffs must satisfy three constitutional requirements.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d. 351  (1992).  They must establish that: (1) they have suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely that the injury may be redressed by judicial action.  Region 8, 993 F.2d at 805.

Moreover, "[t]he party invoking federal jurisdiction bears the burden of proving standing."  Bischoff v. Osceola County, 222 F.3d 874, 878 (11th Cir. 2000); see also Lujan, 504 U.S. at 561, 112 S.Ct. at 2136.  "[E]ach element of standing 'must be supported in the same way as any other matter on which the

24

plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" Bischoff, 222 F.3d at 878 (quoting Lujan, 504 U.S. at 561, 112 S. Ct. at 2136). Therefore, when standing is raised on a motion to dismiss, it may be sufficient to provide "general factual allegations of injury resulting from the defendant's conduct." Id. "However, when standing is raised at the summary judgment stage, the plaintiff can no longer rest on 'mere allegations.'" Id. (quoting Lujan, 504 U.S. at 561, 112 S.Ct. at 2137). Rather, "the plaintiff must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." Id. (citations and quotation marks omitted). And the court must construe the disputed facts in the light most favorable to the plaintiffs. Id.

The injury alleged in this case is the plaintiffs' loss of enjoyment of Florida's waters because they are over-polluted. According to the plaintiffs, Florida is using the Impaired Waters Rule both to remove waterbodies from its Impaired Waters List and to avoid including waterbodies on the list in the first place. When a waterbody is not included on the Impaired Waters List, plaintiffs say, that waterbody is not subject to pollution controls. As a consequence, pollution continues, degrading the waterbodies and conferring harm on the plaintiffs.

25

When Congress "has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." Sierra Club v. Morton, 405 U.S. 727, 732, 92 S. Ct. 1361, 1364-65, 31 L. Ed. 2d 636 (1972). The creation of water quality standards by the states, and the review by the EPA, are plainly intended to "protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreation [and other purposes.]" PUD No. 1, 511 U.S. at 704-05, 114 S. Ct. at 1905-06 (quoting 33 U. S. C. § 1313(c)(2)(A)) (alteration in original). Congress has authorized suit by anyone having an interest that may be adversely affected by agency inaction. See 33 U.S.C. § 1365. The alleged injury may be felt concretely and actually by those who use the affected waters and "for whom the aesthetic and recreational values of the area will be lessened" by the degradation of water quality. Morton, 405 U.S. at 735, 92 S. Ct. at 1366.

The plaintiffs have provided detailed affidavits averring how they are particularly injured by the EPA's failure to review the Impaired Waters Rule. R6-

26

2.  Thus, for example, Plaintiff Linda Young, a resident of Florida, is an avid canoeist and enjoys sailing, swimming, fishing, and other water activities.  R 6-2 at 1.  She uses numerous waterbodies in the state of Florida, including the Ichetucknee River, Sante Fe River, Suwannee River, Blackwater River, Coldwater Creek, Santa Rosa Sound, Juniper Creek, Wakulla River, St. Mark's River, Aucilla River, and numerous lakes and sinkholes in Leon County.  Id.  at 1.  Her enjoyment of Florida's waters, she claims,  has been "severely limited" by the EPA's failure to review the Impaired Waters Rule.  Id.  For example, the Fenholloway River, located south of Tallahassee, she says, used to be "beautiful and clean."  Id.  This waterbody had previously been declared impaired, and the state was required to take steps to monitor and clean the waterbody.  However, because the Impaired Waters Rule caused this waterbody to be delisted from the Impaired Waters List, and because the EPA failed to review the Impaired Waters Rule, at the time suit was filed this "polluted river" was no longer subject to the appropriate clean-up procedures.  According to Young, "the very polluted river remains unfit for fishing or swimming."  Id. at 2.  Thus, plaintiff Young's use of the river has allegedly been impaired because it is polluted and she can not canoe in it, purportedly because of the EPA's inaction.

27

Likewise, Sierra Club member Kathleen Cantwell canoes, swims, and fishes in many of Florida's waterbodies, including the Ichetucknee River, the Santa Fe River, and the Suwannee River as well as the springs connected to these rivers. R6-2 at 1. She avers that she uses waterbodies that were delisted from the Impaired Waters List, or were excluded from the list in the first place, as a result of the Impaired Waters Rule, allowing pollution of the waterbodies to continue. Id. As a result, she too claims that the EPA's failure to review the Impaired Waters Rule has adversely affected her enjoyment of the waterbodies. Id. at 2. In addition, she claims that she used to eat the bass that she caught in the Sante Fe and Suwanee Rivers, but does not do so now because of concerns about heightened levels of mercury. Id. Because Florida delisted sections of those water bodies, Cantwell says that the mercury problem is not being resolved by Florida or the federal government, further diminishing her enjoyment of the waters.[16]

_____

[16]Plaintiff Linda Young and Sierra Club member Kathleen Cantwell are just two of the numerous individuals who have submitted detailed declarations in support of the plaintiffs' claims. In the interest of brevity, we have not detailed the claims of all the individuals who buttress the plaintiffs' position on standing. We do note, however, that in addition to those of Young and Cantwell, the plaintiffs have submitted additional declarations from FPIRG members Holly Binns and Mark Ferrulo, SOS members Loye Barnard, Tommy Brunjes, and Layne Redmond, FSSR member Russell Herrmann, and Sierra Club members Dwight Adams, Linda Pollini, Julia Reiskind, Julia Thaler, Susan Wright, as well as Gladys Lane, a resident of Gainesville, Florida. The allegations contained within these additional declarations echo, in material terms, those made by Young and Cantwell.

For a voluntary membership organization like FPIRG, SOS, FSSR or Sierra Club to have standing, it must meet certain requirements. The Supreme Court has explained that "[a]n

28

The harm that these individuals claim to have suffered -- the pollution of waterbodies that they use and whose integrity the Clean Water Act is intended to protect -- is of a type the courts have recognized as an "injury in fact." See, e.g., Alaska Ctr. for the Env't v. Browner, 20 F.3d 981, 984-986 (9th Cir. 1994) (concluding plaintiffs had standing under Clean Water Act to challenge the EPA's failure to establish maximum pollutant levels for waterbodies in the state of Alaska);  see also Japan Whaling Ass'n v. Amer. Cetacean Soc., 478 U.S. 221, 230, 106 S. Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986) (holding that plaintiffs alleged a sufficient "injury in fact" in that their members' whale-watching and studying would be adversely affected by continued whale harvesting, and this type of injury was within "zone of interests" protected by statute); Biodiversity Legal

_____

association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw, 528 U.S. 167, 181, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000) (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383 (1977)).  The Supreme Court explained the rationale behind these organizational standing requirements by observing that, "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." Warth v. Seldin, 422 U.S. 490, 515, 95 S. Ct. 2197, 2213, 45 L. Ed. 2d 343 (1975).  Those individual members of FPIRG, SOS, FSSR, and Sierra Club who have submitted detailed declarations have standing to pursue claims in their own names.  Moreover, the interests this lawsuit seeks to protect are tied to the organizational missions of these groups, and the prospective relief sought, if awarded, would inure to the benefit of their members, making individual participation unnecessary.  FPIRG, SOS, FSSR and Sierra Club have established the requirements of standing.

Found. v. Badgley, 309 F.3d 1166, 1171 (9th Cir. 2002) (concluding that environmental groups had standing to complain of exclusion of species from list of endangered species).

Moreover, there seems to be little dispute that the plaintiffs have satisfied the other prongs of the standing inquiry. The purported injury -- caused by the continued pollution of the state's waterbodies -- is fairly traceable to the EPA's failure to review the Impaired Waters Rule, since use of the Rule could result in polluted waterbodies being left off the Impaired Waters List and not being cleaned. Finally, the claimed injury may be redressed by requiring the EPA to review the state's Impaired Waters Rule. Thus, we conclude that the plaintiffs have standing to sue.

We turn, then, to the second aspect of the justiciability inquiry: whether the case has become moot. On this point, the EPA contends that the plaintiffs' claims are no longer justiciable because of the EPA's subsequent review of the Group One Update. As with standing, the district court did not grant summary judgment based on mootness, but "[l]ike the requirement of standing, mootness is a justiciability doctrine that must be satisfied before we may decide a case." Granite State Outdoor Adver., Inc. v. Clearwater, 351 F.3d 1112, 1119 (11th Cir. 2003). "The doctrine of mootness derives directly from the case-or-controversy limitation

because an action that is moot cannot be characterized as an active case or controversy. A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Al Najjar v. Ashcroft, 273 F.3d 1330, 1335-36 (11th Cir. 2001) (per curiam) (citations and internal quotation marks omitted). Or, put another way, "a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." Id. Indeed, because mootness is jurisdictional, dismissal is mandated. Id. "Any decision on the merits of a moot case or issue would be an impermissible advisory opinion." Id.

The EPA argues that this case is now moot because, even if the plaintiffs initially had standing, the EPA's subsequent review of the Impaired Waters List nullifies any harm that may have resulted from the EPA's failure to review the Impaired Waters Rule itself. According to the EPA, even if the Impaired Waters Rule changed Florida's water quality standards, the EPA has reversed, and always will reverse, the effect of any change by reviewing the Impaired Waters List (which the Impaired Waters Rule is used to compile). In essence, the EPA says that no harm to the plaintiffs has resulted -- nor could it ever materialize -- from

31

the EPA's failure to review the Impaired Waters Rule, "so long as [the] EPA properly discharges its responsibility to independently assess which waters should be listed based on Florida's underlying water quality standards."[17] Federal Appellees' Br. at 29. However, we believe that the EPA's review of the Group One Update cannot vitiate the plaintiffs' citizen suit, which is based precisely on the EPA's failure to review the Impaired Waters Rule.[18]

In the first place, the EPA's review of the Group One Update has several notable differences from the kind of review required by section 303(c) of the statute. Section 303(c) requires a rigorous examination of many factors, including, inter alia, (1) whether the state's criteria protect the designated water uses; (2) whether the state followed its own legal procedures for revising or adopting standards; (3) whether the state standards are based on appropriate technical and

---

[17]As we apprehend it, the EPA's arguments on mootness and standing are intimately related. The EPA appears to argue, first, that its review of the Impaired Waters List prevents any injury-in-fact from accruing, thus defeating standing. In a similar but alternative formulation, the EPA suggests that its review of the Impaired Waters List has the practical effect of reversing any injury that its failure to review the Impaired Waters Rule could have caused, thus rendering the plaintiffs' claims moot. While the EPA advances variations of this argument to attack standing and assert mootness, we believe this contention is more properly understood as asserting that no "live" controversy exists, and we therefore address this argument in terms of mootness.

[18]Of course, the EPA had not yet reviewed the Group One Update when the plaintiffs filed their complaint. And "[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." Lujan, 504 U.S. at 569 n.4, 112 S. Ct. at 2141 n.4 (emphasis in original) (citation and quotation marks omitted). At the time the plaintiffs filed suit, the EPA had not yet conducted its Group One Update review and it was entirely unclear whether its review would adequately address the alleged infirmities of the state's Impaired Waters Rule.

scientific data and analyses; and (4) whether the revision is consistent with the state's antidegradation policy. See 33 U.S.C. § 1313(d)(4)(B), 40 C.F.R. § 131.5.

It is plain from the EPA Decision Document that the EPA's review of the Group One Update was not as comprehensive as the review mandated by section 303(c) for new or revised water quality standards. In the Group One Update, the EPA never determined whether Florida's Surface Water Quality Standards were properly amended according to Florida's own legal requirements, and the EPA simply assumed that the Impaired Waters Rule was not a change in water quality standards. Having thus assumed as a given the answer to the very question at issue here, the EPA merely examined the Impaired Waters Rule for "reasonableness," rather than subjecting it to the searching review mandated by section 303(c).

The EPA's review of Florida's Impaired Waters List not only involved the application of a more forgiving standard than the proper review of the Impaired Waters Rule under section 303(c), but it occurred at a later stage in Florida's process of identifying impaired waterbodies. As a result, the EPA's subsequent review of Florida's Impaired Waters List would not eradicate any harm the waterbodies sustained in the interim period, after Florida left the waterbodies off the Impaired Waters List, but before the EPA reviewed the updated list.

33

Moreover, notably, the injuries alleged by plaintiffs go beyond those caused by Florida's listing decisions in the Group One Update. The injuries may recur each time the Impaired Waters List is updated, as Florida re-examines data for the remaining four water basin groups (and submits updates for Groups Two through Five). Thus, going forward, the potential for real and concrete injury continues, and injunctive relief may be appropriate. Simply put, the controversy has not been mooted by the EPA's review of the Group One Update.

In addition, Florida's reliance on the EPA's review of its Impaired Waters List is inappropriate because it eliminates one layer of protection envisioned by the Clean Water Act. Under the Act, states are charged, in the first instance, with identifying those waters that are impaired, or are over-polluted according to the states' water quality standards. If Florida could rely on the EPA's review of its Impaired Waters List to ensure that the methods in the Impaired Waters Rule correctly reflected the existing water quality standards, then, for all practical purposes, the power to enforce compliance would reside solely with the federal agency. Yet the Clean Water Act plainly envisions a joint effort between the federal and state governments to enforce pollution controls. See Arkansas, 503 U.S. at 101, 112 S. Ct. at 1054.

In spite of these concerns, the EPA says that this case is moot because the relief the plaintiffs seek -- review of the Impaired Waters Rule by the EPA for consistency with the Clean Water Act -- is no longer meaningful, and cannot redress any legally cognizable injury. According to the EPA, once it decided on June 11, 2003 to approve Florida's Group One Update in part, disapprove it in part, and add certain waterbodies to the list, "any consequence that the Florida [Impaired Waters Rule] may have had to the interests of any member of the public, such as the plaintiffs, merged into the question of the propriety of EPA's action ultimately placing certain Florida waters on the [Impaired Waters List.]" Federal Appellees' Br. at 31-32.

Again, we remain unpersuaded. First, as we have already noted, the EPA's review of the Group One Update was not as comprehensive as a mandated section 303(c) review of the Impaired Waters Rule would be. Second, there is no guarantee that the EPA will conduct thorough reviews of future updates. Finally, we can find no precedent suggesting that the EPA may satisfy a specific duty under one section of the Clean Water Act (33 U.S.C. § 1313(c)(2)-(4)) simply by following the mandate of another section of the Clean Water Act (33 U.S.C. § 1313(d)(2)). Indeed, our case law suggests that, at least for the purpose of evaluating mootness, the only way in which the EPA can satisfy a mandatory duty

35

is by actually discharging that obligation in the manner specifically required by the statute.  See Sierra Club v. Train, 557 F.2d 485, 488 (5th Cir. 1977).[19]  Likewise, in this case, we conclude that the "reasonableness" review of the Group One Update conducted by  the EPA did not satisfy the duty, if it exists, to review the Impaired Waters Rule in the first instance  to determine whether the Rule complies with the requirements of the Clean Water Act.

Quite simply, the controversy between the parties remains alive, the plaintiffs still have a legally cognizable interest in the outcome, and meaningful relief may still be awarded to them.  As we see it, the plaintiffs' claims were not mooted by the EPA's review of the Impaired Waters List.

### C.

We turn then to the plaintiffs' argument on the merits -- that the district court erroneously granted summary judgment  based on the conclusion that the Impaired Waters Rule did not create new or revised water quality standards.  The plaintiffs say, first, that the district court failed to conduct the proper review of the Impaired Waters Rule to determine whether it had the effect of modifying Florida's Surface Water Quality Standards.  The plaintiffs also claim that, had the

_____

[19]The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

district court done so, it would have determined that the Impaired Waters Rule actually changed Florida's Surface Water Quality Standards in at least two principal ways. According to the plaintiffs, the Impaired Waters Rule modified the existing standards by creating numeric nutrient standards where none had previously existed, and by requiring more than one exceedance before waterbodies are classified as impaired, while a single exceedance sufficed under the previous standards.

We agree with the plaintiffs that the district court erred by failing to conduct a thorough review of the effect of the Impaired Waters Rule on the water quality standards of Florida. The district court should have determined whether the practical impact of the Impaired Waters Rule was to revise Florida's Surface Water Quality Standards. In order to do so, the district court was required to look beyond the Florida Department of Environmental Protection's characterization of the Impaired Waters Rule as a methodology or "screening measure" that did not change the standards. Because the district court did not conduct a full analysis, we are constrained to vacate its order of summary judgment and remand for further proceedings consistent with this opinion.

In Miccosukee, we considered a similar situation, where Florida had failed to submit the Everglades Forever Act ("EFA"), Fla. Stat. Ann. § 373.4592 (1994),

37

to the EPA for review and approval. The Miccosukee Tribe of Indians sued, alleging -- like the plaintiffs did in this case -- that the EPA was required to review the newly enacted statute because it changed Florida's water quality standards. Miccosukee, 105 F.3d at 601. In Miccosukee, the district court initially held that "Florida did not consider the EFA as a change in state water quality standards, made no submission to the Administrator and did not trigger the Administrator's duty to evaluate the EFA." Id. As a result, the district court in Miccosukee concluded that it had no jurisdiction to hear the case and dismissed it, just as the district court did in this case.

We held that the district court in Miccosukee erred because it "inappropriately relied on Florida's representations that the EFA did not change Florida's water quality standards." Id. at 602. As we explained, "[e]ven if a state fails to submit new or revised standards, a change in state water quality standards could invoke the mandatory duty imposed on the [EPA] to review new or revised standards." Id at 602. Therefore, we concluded that "[i]n the absence of action by the [EPA] . . . the district court should have conducted its own factual findings." Id. at 603. Because jurisdiction depended on whether the EFA constituted new or revised water quality standards, thereby invoking the EPA's mandatory duty, "the district court had to decide independently the effect of the EFA on existing state

standards." Id.  In other words, "[t]he district court could not simply accept Florida's representations," id., but had to undertake its own inquiry into the actual effect of the EFA.  Because an issue of fact remained as to "whether the EFA changed Florida's water quality standards," id., and because the district court failed to make any determination on the issue, we reversed and remanded for the district court to undertake the proper inquiry.

As we see it, in this case the district court made the same kind of error as the district court did in Miccosukee.  Essentially, it accepted at face value the language in the Impaired Waters Rule saying that the regulation did not change Florida's water quality standards.  But Miccosukee requires more of the district court; rather than simply taking Florida's word for it, the court was required to conduct an independent inquiry into the actual effect of the Impaired Waters Rule. Florida's decision not to describe its own regulations as new or revised water quality standards simply cannot "circumvent the purposes of the Clean Water Act," if in effect the Impaired Waters Rule established new or revised standards. Id. at 602.  If it could, Florida could radically modify its water quality standards, simply disavow that a change had taken place, and the EPA could rely on Florida's disavowal to avoid its mandatory review of the modified standards.

Nor was it proper for the district court, in concluding that the Impaired Waters Rule did not change the existing standards, to rely on the fact that Florida did not follow the mandated procedures to amend its water quality standards. Indeed, the very fact that Florida failed to properly amend Florida's Surface Water Quality Standards is one factor the EPA would be required to consider in a section 303(c) review of the Impaired Waters Rule. See 40 C.F.R. § 131.5 (requiring the EPA to determine "[w]hether the State has followed its legal procedures for revising or adopting standards"). In short, the district court was obliged to "decide independently the effect" that the Impaired Waters Rule had on "existing state standards." Id. at 603.

The record establishes that both the FDEP and the EPA applied the Impaired Waters Rule when they created and approved the Group One Update's changes to Florida's Impaired Waters List. Thus, if waterbodies that under pre-existing testing methodologies would have been included on the list were left off the list because of the Impaired Waters Rule, then in effect the Rule would have created new or revised water quality standards, even if the language of the regulation said otherwise.

This is the crux of the matter. The plaintiffs maintain that, regardless of how the defendants characterize the Impaired Waters Rule, the Rule has the

practical impact of altering Florida's Surface Water Quality Standards. This is true, the plaintiffs suggest, because waterbodies that were considered impaired under the existing standards are <u>not</u> classified as impaired under the Impaired Waters Rule, even when the overall levels of pollution are unchanged. Thus, plaintiffs say, the Rule has the effect of loosening Florida's water quality standards. Even if the Impaired Waters Rule was designed simply as a means to measure which waterbodies met water quality standards and which did not, the plaintiffs maintain that the practical impact of these means necessarily changes the ends, as well. That is, if changing the means used to measure compliance with standards also alters the list of waters deemed compliant, the change in means effectively causes a change in standards, as well.[20]

The defendants respond that the Impaired Waters Rule is properly understood as a methodology, or as a tool, which is used to assess what waterbodies meet the applicable standards. According to the defendants, Florida's

---

[20]While the context of the observation is different, we are reminded of the words of Ferdinand Lassalle, who wrote:

> Show us not the aim without the way.
> For ends and means on earth are so entangled
> That changing one, you change the other too;
> Each different path brings other ends in view.

Ferdinand Lassalle, <u>Franz von Sickingen</u> (quoted in Arthur Koestler, <u>Darkness at Noon</u> 241 (Daphne Hardy trans., MacMillan Publ'g Co. 1987) (1941)).

Surface Water Quality Standards remain unchanged by the Impaired Waters Rule, which merely prescribes specific techniques for measuring whether waterbodies comply with the appropriate standards, or whether they are over-polluted.

In this case, the district court was obliged to determine whether the Impaired Waters Rule had the practical effect of loosening Florida's water quality standards. To undertake that analysis in a meaningful way, it is necessary to examine whether there were waterbodies that were equally polluted both before and after the Impaired Waters Rule took effect, but that were classified differently depending on whether or not the Rule was used.

It is undisputed that numerous waterbodies included on the 1998 Impaired Waters List were de-listed in the Group One Update, following the application of the Impaired Waters Rule. And while the EPA's review of the Group One Update restored a portion of these waterbodies to Florida's Impaired Waters List, several of the de-listed waterbodies were not restored to the list. If the pollution in these waterbodies was in fact reduced prior to the Group One Update, then their de-listing may not indicate a loosening of the water quality standards. It is also possible, however, that these waterbodies remained equally polluted, but were de-listed because the data indicating that fact was insufficient to meet the statistical requirements of the Impaired Waters Rule. If this is correct, then the plaintiffs'

42

claims may be meritorious: the practical effect of the Impaired Waters Rule may indeed have been to loosen Florida's Surface Water Quality Standards.

On this spare and incomplete record, however, it is simply impossible for us to determine, with any confidence, whether the de-listing of these waterbodies resulted from the application of more rigorous statistical methods contained in the Impaired Waters Rule, or whether these waterbodies were removed from the Impaired Waters List because their pollution levels really did drop. What we do think is clear, however, is that the brief consideration the district court gave to the impact of the Impaired Waters Rule was insufficient to satisfy the mandate imposed by Miccosukee for the district court to conduct an independent review. The court unduly relied upon Florida's declarations that there were no modifications to the existing standards, and inappropriately accepted the EPA's assurances that its later review of changes to the Impaired Waters List meant that the Impaired Waters Rule could not "possibly have the effect of revising Florida's water quality standards or policies affecting those standards[.]" Opinion at 12. Accordingly, we remand so that the district court may determine whether the Impaired Waters Rule, as applied, was an effective change to the Florida's existing water quality standards, as applied.

43

Ultimately, whether the district court had jurisdiction to hear the plaintiffs' suit depends on whether the Impaired Waters Rule had the effect of revising or adding to Florida's Surface Water Quality Standards. In answering that question in the negative, the district court did not fully examine the practical impact the Impaired Waters Rule may have had on the state's existing water quality standards -- an examination necessary to the proper resolution of the jurisdictional question. We are, therefore, constrained to vacate the final order of summary judgment and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**