[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-13959

_____

D. C. Docket No. 04-00120-CV-4-SPM-AK

SIERRA CLUB, INC.,
FLORIDA PUBLIC INTEREST
RESEARCH GROUP CITIZEN LOBBY INC.,
SAVE OUR SUWANNEE INC.,

Plaintiffs-Appellants,

versus

MICHAEL O. LEAVITT, In his Official
Capacity as Administrator of the
United States Environmental Protection Agency,
JIMMY PALMER, In his Official Capacity as
Regional Administrator of the United States
Environment Protection Agency Region 4,
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

Defendants-Appellees,

FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

Intervenor.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

**(June 8, 2007)**

Before ANDERSON, BARKETT and BOWMAN,[*] Circuit Judges.

BOWMAN, Circuit Judge:

The Sierra Club, Inc., and two local environmental organizations (collectively, "Sierra Club") filed this lawsuit against the United States Environmental Protection Agency and its administrators (collectively, "the EPA") alleging that the EPA violated its oversight responsibility under section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), by approving Florida's list of impaired waters. The district court, ruling on cross-motions for summary judgment, determined that the EPA's approval was not arbitrary or capricious and entered judgment in the EPA's favor. We affirm in part and reverse and remand in part.

I.

Congress passed the Clean Water Act ("CWA") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Toward that end, Congress determined that the states and the federal

_____

[*]Honorable Pasco Bowman, II, United States Circuit Judge for the Eighth Circuit, sitting by designation.

government should work together to combat water pollution. See Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992) ("The Clean Water Act anticipates a partnership between the States and the Federal Government . . . ."). The CWA thus divides between the federal government (via the EPA) and the states many of the duties for monitoring and regulating the nation's waters. Because an understanding of the responsibilities placed on the states and the EPA is essential to resolving this case, we include here a general discussion of the applicable CWA provisions and regulations.

First, the CWA requires states to establish "water quality standards" for waterbodies within their boundaries. 33 U.S.C. § 1313(a)–(c); see also 40 C.F.R. §§ 130.2(d), 131.4(a). To do this, a state must first designate the use (or uses) to be made of a waterbody, such as water supply, fishing, or swimming. 40 C.F.R. § 131.2. Then, the state must determine the water quality criteria necessary to safely permit the designated use. Id. §§ 131.2, 131.3(b). Those criteria become the "water quality standard" for the waterbody. Id. §§ 131.2, 131.3(i). "Water quality standards play an important role in maintaining and improving the cleanliness and safety of the nation's waterbodies, because they are designed to determine which waterbodies are safe enough to support their designated uses." Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA ("FPIRG"), 386 F.3d 1070, 1074 (11th

Cir. 2004).

Next, each state must compile a list of waterbodies that are not safe enough to support their designated uses, i.e., that do not meet their water quality standards. 33 U.S.C. § 1313(d)(1)(A). This list is known as a state's "impaired waters list" or "303(d) list" (so called because section 303(d) of the CWA, 33 U.S.C. § 1313(d), requires the creation of the list). Each waterbody on the impaired waters list is known as a "water quality limited segment" ("WQLS"). 40 C.F.R. § 130.2(j). The placement of a waterbody on a state's impaired waters list is significant because the CWA requires that states target WQLSs for pollution control.

States undertake the task of decreasing pollution in their WQLSs by establishing a "total maximum daily load" ("TMDL") for pollutants in a designated WQLS. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1). "A TMDL is a specification of the maximum amount of a particular pollutant that can pass through a waterbody each day without water quality standards being violated." Sierra Club v. Meiburg, 296 F.3d 1021, 1025 (11th Cir. 2002) (citing 33 U.S.C. § 1313(d)(1)(C)). States must establish a TMDL for every pollutant that prevents or is expected to prevent a waterbody from attaining applicable water quality standards. 40 C.F.R. § 130.7(c)(1)(ii). Once a TMDL is established, the state (as well as the federal government) strives to decrease the amount of the pollutant to

4

which that TMDL applies so that the TMDL is not exceeded.[1]  The CWA also requires states to "establish a priority ranking [for WQLSs needing TMDL development], taking into account the severity of the pollution and the uses to be made of such waters."  33 U.S.C. § 1313(d)(1)(A); see also 40 C.F.R. § 130.7(b)(4).

States are required to submit their lists of WQLSs, TMDLs, and priority rankings to the EPA every two years.  40 C.F.R. § 130.7(d)(1).  The EPA has the duty of approving or disapproving the lists.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).  If the EPA disapproves a state's impaired waters list or a TMDL, the EPA must issue its own list or TMDL.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

The present dispute arose out of Florida's 2002 update to its 1998 impaired waters list.[2]  In this update, the Florida Department of Environmental Protection ("FDEP") reexamined about twenty percent of Florida's waterbodies,[3] applying

---

[1]When a waterbody is included on a state's impaired waters list, both the state and the federal government "are directed to adjust the amounts of pollution that are permitted by individual, identifiable sources, and to implement more generalized programs to reduce the amount of pollution."  FPIRG, 386 F.3d at 1074 (citing Meiburg, 296 F.3d at 1025–26).

[2]In a rare exception to the biannual-submission requirement, the EPA amended the regulations to remove the requirement that states submit an impaired waters list in 2000.  65 Fed. Reg. 17,170 (Mar. 31, 2000).

[3]"Because Florida has so many waterbodies, the FDEP divided the fifty-two water basins of the state into five distinct basin groups, with each group representing approximately 20% of the State's waters.  The update conducted in 2002 . . . only examined data for the 1600

Florida's water quality standards and Florida's newly passed Impaired Waters Rule ("IWR"), Fla. Admin. Code Ann. Ch. 62-303. Florida then revised its 1998 list and submitted the new list ("Florida's 2002 List") to the EPA for review on October 1, 2002.[4] The EPA conducted its review of Florida's 2002 List and published the results of the review in a "Decision Document" dated June 11, 2003. Decision Document Regarding Department of Environmental Protection's § 303(d) List Amendment Submitted on October 1, 2002 and Subsequently Amended on May 12, 2003, Admin. R. 2.4 ("Decision Document"). The Decision Document indicates that the EPA approved, in large part, Florida's 2002 List, but disapproved Florida's failure to identify certain waterbodies as impaired and Florida's removal (or "delisting") of certain waterbodies that were on the 1998 list. Ultimately, the EPA added eighty WQLSs to Florida's 2002 List.[5]

Sierra Club brought this suit against the EPA under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), alleging that the EPA's approval of Florida's 2002 List was arbitrary, capricious, and not in accordance with the law.

---

waterbodies in the first group." FPIRG, 386 F.3d at 1077–78 n.7. Thus, while Florida's impaired waters list for 2002 included waterbodies in all five basin groups, only waterbodies in the first basin group had been reexamined.

[4]Florida later amended its list on May 12, 2003.

[5]The final list with the additions became Florida's 303(d) list following a notice-and-comment period. See 33 U.S.C. § 1313(d)(2).

Sierra Club's first claim challenged the EPA's approval of Florida's decision not to list waterbodies when the data showing that those waterbodies were impaired consisted solely of fish consumption advisories[6] for mercury or data that was older than 7.5 years. Sierra Club's second claim challenged the EPA's approval of Florida's priority ranking of waterbodies for TMDL development, arguing that Florida did not take into account statutory standards in setting the rankings. Sierra Club's third and final claim challenged the EPA's approval of Florida's delisting of waterbodies where those waterbodies had exceeded applicable water quality standards at least once in the preceding 7.5 years or were delisted because the violations of water quality standards were due to natural conditions. Shortly after Sierra Club filed its complaint, the FDEP moved to intervene in the lawsuit as a defendant. The district court denied intervention. Sierra Club and the EPA eventually brought cross-motions for summary judgment. The district court granted summary judgment to the EPA on all counts.

The FDEP appealed the denial of intervention, and Sierra Club appealed the entry of summary judgment in favor of the EPA.[7] Because we were alerted that a

_____

[6]Fish consumption advisories are notices published by the Florida Department of Health that recommend limits on human consumption of certain types of fish due to pollutants in Florida's waterbodies.

[7]A panel of our Court permitted the FDEP to intervene in Sierra Club's appeal (this case) and then dismissed the FDEP's separate appeal as moot. Sierra Club, Inc. v. Leavitt, No. 04:16154, slip op. (11th Cir. Feb 1, 2006).

case on remand from the Eleventh Circuit to the District Court for the Northern District of Florida might affect our analysis of Sierra Club's summary judgment appeal, see FPIRG, 386 F.3d 1070, we held our decision in abeyance pending the outcome of that case. The District Court for the Northern District of Florida issued its opinion on remand in FPIRG on February 15, 2007. FPIRG, No. 4:02cv408-WS, slip op. (N.D. Fla. Feb. 15, 2007). We have reviewed that decision and conclude that it does not affect our ability to rule on the present appeals.

II.

We begin by addressing the FDEP's appeal of the district court's order denying intervention as of right under Federal Rule of Civil Procedure 24(a)(2).[8] Our review of the denial of a motion for intervention as of right is de novo. Georgia v. United States Army Corps of Eng'rs, 302 F.3d 1242, 1249 (11th Cir. 2002).

Intervention as of right under Rule 24(a)(2) must be granted when four requirements are met:

> (1) the application to intervene is timely; (2) the applicant has an interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that the disposition of the action, as a practical matter, may impede or impair his ability to

---

[8]The FDEP sought both intervention as of right under Federal Rule of Civil Procedure 24(a)(2) and permissive intervention under Federal Rule of Civil Procedure 24(b). On appeal, however, the FDEP only challenges the denial of intervention as of right.

protect that interest; and (4) the applicant's interest will not be represented adequately by the existing parties to the suit.

ManaSota-88, Inc. v. Tidwell, 896 F.2d 1318, 1321 (11th Cir. 1990). We need not discuss the first three requirements because we conclude that the FDEP has not met its burden of proof on the fourth requirement.

The FDEP asserts an interest in "the regulation of water quality of Florida's waters," Br. of Intervenor/Appellee at 7, and contends that with each WQLS added to Florida's impaired waters list, a new TMDL is established and the FDEP must expend resources to establish and enforce pollution-discharge permits, id. at 5–6, 15. The FDEP's objective in this litigation, therefore, is to defend Florida's 2002 List—which was revised and approved by the EPA—and prevent the addition of waterbodies to the list. Id. at 15. This objective is the same as the EPA's objective.

"We presume adequate representation when an existing party seeks the same objectives as the would-be interveners." Clark v. Putnam County, 168 F.3d 458, 461 (11th Cir. 1999). While this presumption is "weak," it nonetheless imposes upon the applicant for intervention "the burden of coming forward with some evidence to the contrary." Id. The FDEP has presented no evidence that the EPA may not adequately represent its interests. The FDEP adopts the EPA's brief on appeal in its entirety, and the FDEP does not suggest that it would take a position

9

different from the EPA's in the district court.[9]

A similar situation was addressed by the Fifth Circuit in <u>Associated Industries of Alabama, Inc. v. Train</u>, 543 F.2d 1159 (5th Cir. 1976).[10]  In <u>Train</u>, the Attorney General of Alabama sought to intervene as a defendant in a case challenging as arbitrary and capricious the EPA's disapproval of Alabama's water quality standards and substitution of EPA-promulgated standards.  The Court affirmed the denial of intervention as of right, reasoning that although the state had an interest in protecting its citizens from overly lax water quality standards, "[w]hen the issue for decision in this case is stated in terms of the legality of the EPA promulgation under § 303 of the [CWA], it is apparent . . . that Alabama's interests in the litigation are adequately represented by existing parties."  <u>Id.</u> at 1161 n.7 (internal quotations omitted).  This reasoning applies with equal force here: the FDEP's and the EPA's mutual interest in this case is to defend the legality of the EPA's approval of Florida's 2002 List.  As in <u>Train</u>, nothing in the record

---

[9]The FDEP asserts that the fact that the EPA added waterbodies to Florida's 2002 List demonstrates that the FDEP and the EPA have different interests.  While a proposed intervener and a party might, as a general matter, have different interests, the relevant Rule 24(a)(2) inquiry is whether the party will represent the proposed intervener's interest <u>with respect to the subject matter of the action</u>.  In this action, the EPA and the FDEP have the same interest in seeing that the EPA's approval of Florida's 2002 List is upheld so that no additional waterbodies are added to the list.

[10]The decisions of the Fifth Circuit before October 1, 1981, constitute binding precedent in the Eleventh Circuit.  <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

10

before us "cast[s] doubt upon the will of the EPA to defend the legality of [its] promulgation." Id. at 1161. Likewise, "[n]o claim or defense on behalf of [Florida] has been suggested which is not or will not be asserted by the EPA defendants." Id. While the FDEP hypothesizes that the EPA might have an increased incentive to compromise with Sierra Club in settlement discussions because Florida, not the EPA, bears the brunt of the costs that accompany TMDL development, nothing in the record supports the suggestion that the EPA is more likely to settle. Cf. Clark, 168 F.3d at 462 (granting intervention where a "discussion of settlement that was mentioned on the record at [a] hearing" indicated that the proposed defendant-interveners and the defendants had divergent positions on settlement). Moreover, the Train Court rejected a similar argument—"that the effect of a plaintiff's victory in this suit will be greater upon the State than upon the EPA"—because the argument did not reflect upon the vigor of the EPA's defense of its actions. Train, 543 F.2d at 1160.

We conclude that the interests of the FDEP are adequately represented by the EPA, and we affirm the district court's denial of intervention.

III.

We review the district court's grant of summary judgment de novo, applying the same legal standards as the district court. See Nat'l Parks Conservation Ass'n

11

v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003). Summary judgment is proper if, when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Fed. R. Civ. P. 56(c)).

Under the APA, a court shall "set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is considered arbitrary or capricious if the agency has

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

When an agency interprets a statute that the agency is responsible for administering, courts must give the agency's interpretation due deference if (1) Congress has delegated interpretive authority to the agency,[11] (2) the statute is

---

[11] "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." United States v. Mead Corp., 533 U.S. 218, 230 (2001). In the CWA, Congress explicitly delegated the approval or disapproval of a state's impaired waters list to the EPA and directed that if the EPA determined that additions to a list were necessary, the "State shall incorporate them into its current plan." 33 U.S.C. § 1313(d)(2). We deem this a delegation of interpretive authority to the

12

silent or ambiguous with respect to the issue at hand,[12] and (3) the agency's interpretation of the statute is reasonable. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984); United States v. Mead Corp., 533 U.S. 218, 229 (2001). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Chevron, 467 U.S. at 844; see also Sierra Club v. Johnson, 436 F.3d 1269, 1274 (11th Cir. 2006). Likewise, courts must give deference to an agency's reasonable interpretation of its own regulations. Sierra Club v. Johnson, 436 F.3d at 1274. "We will uphold the agency's interpretation of its regulations so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." Id. (internal quotation marks and citation omitted).

## IV.

Before discussing the specific arguments raised by Sierra Club and decided by the district court, we address Sierra Club's more general and further-reaching argument—raised for the first time on appeal—that Florida's 2002 List must be invalidated in its entirety because it was developed under the IWR, portions of

---

agency.

[12]Where the statute directly addresses an issue, we give the language of the statute effect and accord no deference to the agency's interpretation. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984).

which were later abrogated.[13]  See FPIRG, 386 F.3d at 1075–77; FPIRG, No.

4:02cv408-WS, slip op. at 12 (N.D. Fla. Feb. 15, 2007).  "As a general rule, an

appellate court will not review a legal issue or theory not presented to the trial

court, unless the issue is a pure question of law and the court's failure to consider it

would result in a miscarriage of justice."  NAACP v. Hunt, 891 F.2d 1555, 1563

(11th Cir. 1990).  Because this argument does not involve a pure question of law

and our failure to consider it will not result in a miscarriage of justice, we decline

to review it.[14]

---

[13]Following oral argument, Sierra Club filed a letter pursuant to Federal Rule of Civil Procedure 28(j), addressing certain provisions of the IWR.  The FDEP and the EPA moved to strike the letter, arguing that they were not properly served a copy of the letter and that the information in the letter was not relevant to an issue on appeal.  The motions to strike are denied. Although Rule 28(j) did require Sierra Club to serve a copy of the letter on all other parties, Sierra Club's inadvertent failure to do so did not prejudice the EPA or the FDEP.  Moreover, the information contained in the letter, while having no impact on our ultimate decision, was relevant to arguments presented in the briefs and discussed at oral argument.

[14]Even if we were to consider it on its merits, Sierra Club's argument would fail.  The record in this case demonstrates that the EPA applied Florida's previously approved water quality standards, rather than the IWR, in reviewing Florida's 2002 List.  See Decision Document at 4 ("While the guidelines, protocols, and requirements in the IWR may be useful tools for the state to use in identifying impaired waters, because they have not been used before and they are not part of the State's water quality standards, EPA did not rely on the methodology in reviewing Florida's list."), 16–17 ("While each of these [IWR] guidelines may be useful tools for the State to use in identifying water quality limited segments, because they have not been used before and they are not part of the State's water quality standards, EPA did not rely on them in reviewing Florida's list."), 24 ("As EPA reviewed Florida's list based on Florida's approved water quality standards, not the IWR, EPA determined whether the data guidelines contained in the IWR overly restricted data analysis and, therefore, led to FDEP not identifying water quality limited segments during its assessment . . . .").

14

We turn now to issues that Sierra Club raised in the district court. Sierra Club first alleges that the EPA's decision to approve Florida's 2002 List was arbitrary and capricious because the list was missing waterbodies for which available data indicated the presence of dangerous levels of mercury. The CWA requires that states identify all waterbodies within their boundaries that do not meet or are not expected to meet water quality standards. See 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. §§ 130.2(j), 130.7(b)(1). EPA regulations require states to "assemble and evaluate all existing and readily available water quality-related data and information to develop [their impaired waters lists]." 40 C.F.R. § 130.7(b)(5) (emphasis added). Sierra Club asserts that the FDEP violated this mandate when it: (A) applied a provision of the IWR that prohibited the use of "data more than 7.5 years old" in developing Florida's 2002 List, Fla. Admin. Code Ann. r. 62-303.400; and (B) failed to consider fish consumption advisories for mercury. As a result, Sierra Club claims, Florida's 2002 List violates the CWA because it does not include all waterbodies in the state that do not meet or are not expected to meet water quality standards.

## A.

The district court concluded that Florida and the EPA were permitted to use

a 7.5-year data cutoff.  In reaching this conclusion, the district court relied on 40 C.F.R. § 130.7(b)(6)(iii).  That regulation requires that states, when submitting their impaired waters lists to the EPA for approval, include with their submission "[a] rationale for any decision to not use any existing and readily available data and information."  40 C.F.R. § 130.7(b)(6)(iii).  The district court considered Florida's rationale for the 7.5-year data cutoff (i.e., that data from the Everglades indicated a decrease in mercury accumulation and that Florida desired to make listing decisions based on current conditions) and the EPA's reasons for finding the data cutoff "'reasonable'" (discussed below), and apparently found § 130.7(b)(6)(iii) satisfied.  Order on Summary Judgment at 13 (quoting Decision Document at 23).  We believe that the district court's reliance on § 130.7(b)(6)(iii) was misplaced.

While § 130.7(b)(6)(iii) implies that Florida has a right to decide not to <u>use</u> certain data, it does not obviate the requirement in § 130.7(b)(5) that Florida <u>evaluate</u> all existing and readily available data.  By taking the hard-line approach of not considering any data older than 7.5 years—even when there is no more current data for a particular waterbody—Florida has not fulfilled § 130.7(b)(5)'s evaluation requirement.  Moreover, states are required by the CWA to identify <u>all</u> waterbodies that fail to meet water quality standards, 33 U.S.C. § 1313(d)(1)(A); states cannot shirk this responsibility simply by claiming a lack of current data.

16

The district court misinterpreted the CWA's statutory and regulatory scheme when it held to the contrary, and we must therefore remand this issue for an analysis under the correct legal standard.

On remand, of course, the district court will evaluate the EPA's decision to approve Florida's 2002 List, not the methodology underlying Florida's creation of the list. In the EPA's review, the EPA recognized Florida's failure to fully comply with § 130.7(b)(5), noting that the IWR "only provides for assessment when . . . data meets certain temporal and spacial guidelines set out in the rule." Decision Document at 23–24. Nevertheless, "[i]n reviewing data as evidence of water quality for purposes of identifying water quality limited segments," the EPA "chose to look only at data collected within the past 7.5 years." Id. at 23. Thus, the EPA adopted the same 7.5-year data cutoff applied by the FDEP. The EPA reasoned that the data cutoff was reasonable "since older data can be less reliable in representing current conditions." Id. at 23. While the EPA's data-cutoff decision contradicts the CWA's statutory and regulatory language such that it is not entitled to deference, see Chevron, 467 U.S. at 842–43, the EPA asserts that this decision did not lead to any impaired waterbodies being left off Florida's 2002 List. Sierra Club disagrees with the EPA's assertion. According to Sierra Club, sixty-one waterbodies—listed in Attachment A to the Amended Complaint—were excluded

17

from Florida's 2002 List because of the 7.5-year data cutoff.[15]  This is a factual

dispute that we leave for the district court to address on remand.  Unless the

dispute is resolved or found not material, it may preclude the entry of summary

judgment on Sierra Club's first claim.[16]

B.

The district court also rejected Sierra Club's argument that Florida and the

EPA must place waterbodies subject to statewide fish consumption advisories[17] on

_____

[15]The EPA has responded that the waterbodies listed in attachments to the complaint were excluded from Florida's 2002 List because they were not included in a 2003 fish consumption advisory for mercury; in other words, the waterbodies were excluded because of current data, not the lack of current data.  Sierra Club disagrees with this contention, arguing that, in fact, the waterbodies were under a fish consumption advisory for mercury in 2003.

[16]In support of its factual positions discussed here and in Section V.B below, Sierra Club directs us to a document showing Florida Department of Health fish testing data for 1990–1992 (which was attached to Sierra Club's summary judgment response brief) and to a 2000 Florida fish consumption advisory for mercury (which was appended to Sierra Club's appellate reply brief).  The EPA has moved to "have these documents struck from consideration on appeal." Federal Defendants-Appellees Motion to Strike Extra Record Documents at 1.  Because we decline to resolve factual disputes, the EPA's motion is denied as moot.  We note, however, that because the document containing the 1990–1992 fish testing data was filed in the district court without objection, it is properly part of the record on appeal.  See Fed. R. App. P. 10(a)(1).  On remand, Sierra Club is free to request that the district court supplement the administrative record with these documents or consider them as extra-record material necessary to determine whether the EPA considered all relevant factors in making its decision.  See, e.g., Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 760 n.5 (9th Cir. 1996) (ruling that a court reviewing agency action may look beyond the administrative record to determine if the agency examined all relevant factors); United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1428 (6th Cir. 1991) (same).

[17]Statewide fish consumption advisories warn of the potential of widespread contamination in certain species of fish.  They are based on data from a sampling of waterbodies. In contrast, waterbody-specific fish consumption advisories reflect the water quality of a specific waterbody and are based on data from that waterbody.

18

the impaired waters list because such waterbodies do not meet or are not expected to meet water quality standards. See 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. §§ 130.2(j), 130.7(b)(1). The district court deferred to the EPA's position, originally set forth in an EPA "guidance letter," that only waterbody-specific data (such as waterbody-specific fish consumption advisories) constitute "existing and readily available [water quality-related] data and information" that states must consider in developing their impaired waters lists. EPA guidance letter of Oct. 24, 2000, Admin. R. 1.8 at 3.

Because there is no indication that the EPA's guidance letter was the product of a "formal [agency] adjudication," "notice-and-comment rulemaking," or "any other circumstances reasonably suggesting that Congress ever thought of [guidance letters] as deserving . . . deference," the EPA's guidance letter is not entitled to Chevron deference. Mead Corp., 533 U.S. at 230–31; see also Christensen v. Harris County, 529 U.S. 576, 587 (2000) (ruling that agency interpretations in opinion letters, policy statements, agency manuals, and enforcement guidelines are not entitled to Chevron deference). That is not to say, however, that the EPA's guidance letter is entitled to no deference at all. Rather, the "'specialized experience'" of the EPA and "the value of uniformity in [the EPA's] administrative . . . understandings of what a national law requires" entitles the guidance letter to

19

"a respect proportional to its 'power to persuade.'" Mead Corp., 533 U.S. at 234–35 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139–40 (1944)).

Like the district court, we are persuaded by the guidance letter and the EPA's position on statewide fish consumption advisories. In the guidance letter, the EPA directs that for the purpose of compiling impaired waters lists, fish consumption advisories constitute data demonstrating a waterbody's non-attainment of a "fishable" use only when: "the advisory . . . is based on [fish] tissue data, the data are from the specific waterbody in question, and the risk assessment parameters of the advisory . . . are cumulatively equal to or less protective than those in the water quality standards." EPA guidance letter of Oct. 24, 2000, Admin. R. 1.8 at 6 (emphasis added). The EPA warns that statewide fish consumption advisories do not demonstrate the need to place a waterbody on a state's impaired waters list because the criteria applicable to statewide fish consumption advisories do not parallel the criteria for forming an impaired waters list:

> For example, a State may have issued a statewide or regional warning regarding fish tissue contaminated with a bioaccumulative pollutant, based on data from a subset of waterbodies. A State may use a higher fish consumption value in determining the need for an advisory compared to the value used in establishing water quality criteria for the protection of human health. . . . In such instances . . . they need not be listed as impaired under section 303(d) unless there are waterbody-specific data . . . showing non-attainment of section 101(a) uses.

20

Id. at 4.  We find the informed judgment of the EPA thorough and reasonable, and entitled to some deference.  See Skidmore, 323 U.S. at 140.

In reviewing Florida's 2002 List, the EPA noted that Florida's listing methodology for use of fish consumption advisories followed the EPA's guidance letter.  Decision Document at 41.  This listing methodology states that fish consumption advisories may only be used if the data underlying the fish consumption advisory "is based on the statistical evaluation of fish tissue data from at least twelve (12) fish collected from the specific water segment or water body to be listed."  Fla. Admin. Code Ann. r. 62-303.470(1)(a) (emphasis added) (discussed in Decision Document at 38).  The EPA concluded that "the State's process, if properly applied, is reasonable for identifying applicable water quality limited segments."  Decision Document at 41.  We cannot find this decision arbitrary or capricious.   The EPA gave a rational explanation, based on the opinion of its experts, as to why statewide fish consumption advisories (to the extent that they are not based on data collected from a specific waterbody in question) are not reliable indicators of water quality in a particular waterbody for the purpose of forming an impaired waters list.  We therefore uphold the EPA's decision that Florida was required to consider only waterbody-specific data in developing its 2002 List.

21

There is more to the matter than this, however. Sierra Club argues that even accepting the EPA's position, Florida and the EPA did not adhere to the guidance letter's mandate that states consider waterbody-specific data in developing their impaired waters lists. According to Sierra Club, "[a]t least 46 of the waters named in this lawsuit are under waterbody-specific fish consumption advisories issued by the Florida Department of Health; and numerous waters have fish tissue testing by the Department of Health supporting the advisory. Thus, under the Guidance Document, they were required to be on the § 303(d) list." Br. for Plaintiffs-Appellants at 44.[18] This is another factual matter[19] that we leave to the district court's consideration in its evaluation of whether the EPA's approval of Florida's 2002 List was arbitrary or capricious.[20]

[18]Sierra Club notes that a 2002–2003 Florida Freshwater Sport Fishing Regulation Brochure listed twenty-four lakes with high concentrations of mercury based on waterbody-specific testing and that certain statewide fish consumption advisories were based on fish tissue testing of a particular waterbody in question, see supra notes 15–16. According to Sierra Club, this waterbody-specific data meets the EPA's criteria for consideration.

[19]It appears (though we cannot tell for certain) that the district court recognized this factual dispute. Order on Summary Judgment at 15–17. Nonetheless, the district court entered summary judgment for the EPA. We cannot tell from the order whether the district court perhaps deemed this factual dispute not material or, after reviewing the record, determined that there was no factual dispute after all. We emphasize that summary judgment is only appropriate when there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).

[20]We note that Florida's listing methodology for fish consumption advisories also includes a provision mandating that such advisories only be used if "[t]here are sufficient data or other information from within the last 7.5 years that would support the continuation of the advisory." Fla. Admin. Code Ann. r. 62-303.470(1)(c) (discussed in Decision Document at 38). Because our holding in Section V.A that Florida's 7.5-year data cutoff is inconsistent with the CWA applies to Florida's temporal limit to fish consumption advisories, the district court must

22

Finally, we reject Sierra Club's claim that the EPA violated the CWA when it allegedly added to Florida's 2002 List eleven waters under fish consumption advisories for mercury that had been delisted from Florida's 1998 List. Sierra Club argues that when the EPA determines that a state's list is incomplete, the EPA's "only option under CWA § 303(d)(2) is to disapprove that list and establish a complete list of its own." Br. for Plaintiffs-Appellants at 52. The EPA objects to the factual premise of Sierra Club's claim, but even if the facts are as Sierra Club alleges, the claim has no merit. The CWA directs that if the EPA disapproves a state's identification of impaired waters and the TMDLs established for them, the EPA must "identify such waters in such State and establish such loads for such waters as [it] determines necessary to implement the water quality standards applicable to such waters." 33 U.S.C. § 1313(d)(2). We do not read this provision to require the EPA to develop an entirely new list each time it partially disapproves a state's list. Nothing in the CWA prohibits the EPA's current practice of adding waterbodies to an impaired waters list already prepared by a state; to require more would be impractical and a waste of resources.

We therefore reverse the entry of summary judgment on Sierra Club's first claim, but uphold the district court's holdings deferring to the EPA's positions that

address on remand whether this limit on the fish consumption advisories that the FDEP considered had any impact on Florida's impaired waters list.

23

(1) Florida was only required to consider fish consumption advisories based on waterbody-specific data and (2) the EPA may add waterbodies under fish consumption advisories to a state's impaired waters list.  We remand this claim for further proceedings.

VI.

In Sierra Club's second claim for relief, it alleges that the EPA's approval of Florida's priority ranking of WQLSs for TMDL development was arbitrary and capricious.  Under the CWA, Florida was required to "establish a priority ranking for [impaired] waters, taking into account the severity of the pollution and the uses to be made of such waters."  33 U.S.C. § 1313(d)(1)(A); see also 40 C.F.R. § 130.7(b)(4) (requiring states to include in their impaired waters lists "a priority ranking for all listed water quality-limited segments still requiring TMDLs, taking into account the severity of the pollution and the uses to be made of such waters") and (d)(1) (requiring states to submit to the EPA "the list of waters, pollutants causing impairment, and the priority ranking including waters targeted for TMDL development within the next two years").  Florida established its priority ranking, designating each WQLS as "high," "medium," or "low" priority.  Sierra Club argues that in establishing this priority ranking, Florida did not adequately take into account the statutory factors of "severity of the pollution" and "uses to be made of

24

such waters." Florida categorically designated as "low" priority all "[w]ater segments that are listed before 2010 due to fish consumption advisories for mercury (due to the current insufficient understanding of mercury cycling in the environment)." Fla. Admin. Code Ann. r. 62-303.500(3)(a).

According to Sierra Club, mercury in fish tissue presents a serious health risk, such that mercury-impaired waters would be designated "high" priority if the relevant statutory factors were given adequate consideration. Sierra Club argues that Florida's categorical designation of mercury-impaired waters as "low" priority both violated the mandate of the CWA (requiring states to take into account the severity of pollution and uses to be made of the waterbody) and was based on a faulty premise (the alleged insufficient understanding of mercury cycling). Thus, Sierra Club asserts, the EPA was wrong to approve Florida's priority ranking.

The district court did not address the underlying merits of Sierra Club's argument. Rather, the district court ruled that the argument failed because the EPA had no duty to approve Florida's priority ranking:

> Because there is no requirement that the EPA actually approve or disapprove of a state's priority rankings, the Court finds that Defendants have met their burden of showing the absence of a genuine issue of material fact on this matter, and summary judgment is granted in favor of Defendants as to Count II.

Order on Summary Judgment at 18. The district court seems to have construed

Sierra Club's argument to have been that the EPA had a duty to approve the specific level of ranking assigned by Florida to each WQLS. The district court rejected that argument, holding that the EPA had no such duty. We need not address that issue, however, because we conclude that the district court misconstrued Sierra Club's argument.

While Sierra Club's argument does implicate the ultimate priority-ranking designation (i.e., "low," "medium," or "high") that Florida gave to some WQLSs, Sierra Club's true challenge is to the factors that Florida considered in assigning the designations. Sierra Club contends that Florida did not consider the "severity of the pollution" and the "uses to be made" of the WQLSs as required by 33 U.S.C. § 1313(d)(1)(A). The EPA acknowledges that "it must ensure that the state has in fact ranked its priorities taking into account the statutory factors." Br. for Federal Defendants-Appellees at 45 n.14 (emphasis added); see also Decision Document at 8 ("In prioritizing and targeting waters, states must, at a minimum, take into account the severity of the pollution and the uses to be made of such waters. See § 303(d)(1)(A). As long as these factors are taken into account, the Act provides that states establish priorities."). In its review of Florida's 2002 List (which included the priority ranking), the EPA concluded that Florida "prioritized water quality limited segments for TMDL development according to the severity of the

26

impairment and the designated uses of the segment."  Decision Document at 49.  It is this conclusion that Sierra Club challenges.

The resolution of this issue will involve an examination of whether the EPA's decision is supported by the evidence in the administrative record.  We believe that the district court should consider the question in the first instance, particularly in light of the factual matters that it raises.[21]  We therefore vacate the entry of summary judgment on Sierra Club's second claim and remand the claim to the district court for further proceedings.

VII.

In Sierra Club's third claim for relief, Sierra Club challenges the EPA's approval of Florida's delisting of forty-five waterbody/pollutant combinations[22] that had been on Florida's 1998 List.[23]  According to Sierra Club, (A) thirty-eight of the challenged combinations involved water segments that had exceeded applicable water quality standards at least once in the preceding 7.5 years, and (B)

---

[21]We also leave it to the district court to address, if necessary, Sierra Club's factual argument that Florida did not have an insufficient understanding of mercury cycling in the environment and Sierra Club's legal argument that even if Florida did have an insufficient understanding, the CWA does not permit states to consider such a lack of understanding when making their priority rankings.

[22]Each waterbody/pollutant combination is listed separately, meaning, for example, that if a waterbody has two pollutants then the waterbody is listed two times.

[23]Sierra Club's complaint also challenged the delisting of nineteen waterbody/pollutant combinations that allegedly contained excessive nutrients, but Sierra Club has not appealed the entry of summary judgment as to those nineteen combinations.

seven of the challenged combinations involved waterbodies that were delisted because their violations of water quality standards were deemed the result of natural conditions.

Both sides cite an EPA guidance document and agree that a state may remove a waterbody from its impaired waters list if the "waterbody is meeting all applicable water quality standards . . . or is expected to meet these standards in a reasonable timeframe" or if "the original basis for listing is determined to be inaccurate." Guidance for 1994 Section 303(d) Lists, Nov. 26, 1993, Supp. Admin. R. G at 7. The parties disagree, however, about whether the delisted combinations fall under either of these two categories—Sierra Club argues that they do not; the EPA argues that they do.

## A.

First, we address Sierra Club's assertion that the EPA acted arbitrarily or capriciously in approving Florida's delisting of thirty-eight waterbody/pollutant combinations in the face of data showing that the waterbodies involved were not meeting water quality standards. Under Florida's water quality standards, the water quality criteria applicable to a waterbody are "not to be exceeded at any time." Fla. Admin. Code Ann. r. 62-302.530. Sierra Club asserts that the challenged waterbody/pollutant combinations exceeded water quality criteria and standards

28

several times in the 7.5 years immediately preceding the development of Florida's 2002 List. Thus, according to Sierra Club, the EPA erred in approving the delisting of the thirty-eight waterbody/pollutant combinations.[24]

In the Decision Document, the EPA recognized that some of Florida's water quality criteria are "not to be exceeded at any time," but determined that it was reasonable for Florida to interpret that regulatory phrase in concert with the legislation authorizing the creation of Florida's water quality standards. Decision Document at 20. Specifically, the relevant statute states:

> It is the intent of the Legislature that water quality standards be reasonably established and applied to take into account the variability occurring in nature. The [FDEP] shall recognize the statistical variability inherent in sampling and testing procedures that are used to express water quality standards. The [FDEP] shall also recognize that some deviations from water quality standards occur as the result of natural background conditions. The [FDEP] shall not consider deviations from water quality standards to be violations when the discharger can demonstrate that the deviations would occur in the absence of any human-induced discharges or alterations to the water body.

---

[24]In its reply brief, Sierra Club also asserts that "the Impaired Water Rule's frequency requirements contradicted the existing water quality standards." Reply Br. for Plaintiffs-Appellants at 27. We will not address this argument because, in addition to Sierra Club's failure to raise it in the district court, see discussion supra Section IV, Sierra Club does not elaborate on this allegation or direct us to any specific frequency requirements that have been abrogated. See Fed. R. App. P. 28(a)(9)(A) (requiring an appellant brief to include "citations to the authorities and parts of the record on which the appellant relies"); Flanigan's Enters., Inc. v. Fulton County, Ga., 242 F.3d 976, 987 n.16 (11th Cir. 2001) (per curiam) (ruling that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument), cert. denied, 536 U.S. 904 (2002).

Fla. Stat. § 403.021(11). The EPA noted that because Florida does not have a monitoring program that continuously measures all points in its waterbodies (and thus the FDEP could never determine that a waterbody had not exceeded water quality criteria "at any time"), Florida must use statistical sampling to estimate a waterbody's compliance with water quality standards. Florida's Legislature recognized that sampling introduces variability into the testing process—some due to natural variability and some associated with sample collection and analysis. Thus, the EPA concluded, a single sample does not determine whether a waterbody fails to meet water quality standards. Instead, the EPA "considered a number of factors" in reviewing whether a waterbody was impaired. Decision Document at 21. "These factors included whether more recent data show attainment that renders earlier data suspect (trends); the magnitude of exceedance; the frequency of exceedance; pollutant levels during critical conditions; and any other site-specific data and information such as biological monitoring, whether new controls have been implemented on the water, etc." Id.[25]

Like the district court, we find the EPA's "totality" approach reasonable.

_____

[25]Sierra Club asserts that the EPA's treatment of the challenged waterbody/pollutant combinations was inconsistent because the EPA approved the delisting of a bay for which 17.6% of the samples showed exceedance but disapproved the delisting of a creek for which 16.1% of the samples showed exceedance. Sierra Club's argument fails to account for the fact that "frequency of exceedance" was only one factor considered by the EPA in its review.

30

Sierra Club has presented no evidence suggesting that the approach is arbitrary, capricious, or in conflict with the CWA. Section 403.021(11) of the Florida Statutes mandates that statistical and natural variability be taken into account in applying water quality standards. Likewise, rule 62-302.530 of the Florida Administrative Code, while stating that the water quality criteria "express the maximum not to be exceeded at any time," also directs that "[i]n applying the water quality standards, the [FDEP] shall take into account the variability occurring in nature and shall recognize the statistical variability in herent [sic] in sampling and testing procedures." Fla. Admin. Code Ann. r. 62-302.530. Rule 62-302.530 of the Florida Administrative Code thus appears consistent with section 403.021(11) of the Florida Statutes, but to the extent the regulation could be read to conflict with the statute, the statute controls. See United States v. Marte, 356 F.3d 1336, 1341 (11th Cir. 2004); Fla. Dept. of Revenue v. A. Duda & Sons, Inc., 608 So. 2d 881, 884 (Fla. Dist. Ct. App. 1992). We affirm the district court's entry of summary judgment for the EPA on the delisting of these thirty-eight waterbody/pollutant combinations.[26]

---

[26]The EPA further asserts that in addition to meeting water quality standards, thirty-two of the combinations (those listed for total or fecal coliforms) were also delisted because their original listing was based on a flaw in analyzing data. Given our holding, we need not address this additional argument.

31

B.

Next, Sierra Club asserts that the EPA acted arbitrarily or capriciously in approving Florida's delisting of seven waterbodies not meeting water quality standards due to natural conditions. In particular, Sierra Club claims that seven waterbodies with naturally occurring low dissolved oxygen levels[27] were improperly delisted because the CWA does not provide a natural-conditions exception. The EPA disagrees and argues that in accordance with the CWA, it reviewed Florida's delisting decision for consistency with Florida's water quality standards. The CWA does not specifically address whether waterbodies not meeting water quality criteria because of naturally occurring conditions must be included on a state's impaired waters list. The EPA's interpretation of the CWA as not requiring such listings, however, is supported by a careful reading of the CWA and its regulations.

First, the CWA's express purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The phrase "restore and maintain" indicates that Congress sought to return waterbodies to their natural conditions, not modify waterbodies' natural conditions.

_____

[27]Dissolved oxygen is found in microscopic bubbles that occur between water molecules. Sheila Murphy, General Information on Dissolved Oxygen, http://bcn.boulder.co.us/basin/data/ BACT/info/DO.html (last visited May 10, 2007). Dissolved oxygen is important to aquatic life because fish "breathe" by absorbing it through their gills. Id.

32

Indeed, the House Report on the legislation states that "[t]he word 'integrity' as used is intended to convey a concept that refers to a condition in which the natural structure and function of ecosystems is maintained." H.R. Rep. No. 92-911, at 76 (1972).

Second, the provision of the CWA requiring that states compile impaired waters lists directs states to identify waters for which pollutant discharge limits "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A). As the EPA recognized, to apply this provision, one must examine Florida's water quality standards applicable to the seven waterbodies at issue. Florida's water quality standards provide: "Waters having water quality below the criteria established for them shall be protected and enhanced. However, the [FDEP] shall not strive to abate natural conditions." Fla. Admin. Code. Ann. r. 62-302.300(15). Sierra Club argues that this standard only addresses whether Florida "will work on these waters," not whether the naturally impaired waters should be included on Florida's impaired waters list. Reply Br. for Plaintiffs-Appellants at 26. We do not accept Sierra Club's narrow interpretation of Florida's water quality standards. As noted above, a Florida statute that authorized the creation of Florida's water quality standards directs that the standards be applied in a manner that "take[s] into account the variability occurring

33

in nature." Fla. Stat. § 403.021(11); see also Fla. Admin. Code Ann. r. 62-302.530 ("In applying the water quality standards, the Department shall take into account the variability occurring in nature . . . ."). Because "some deviations from water quality standards occur as the result of natural background conditions," the legislature ordered that the FDEP "shall not consider deviations from water quality standards to be violations when the discharger can demonstrate that the deviations would occur in the absence of any human-induced discharges or alterations to the water body." Fla. Stat. § 403.021(11). When Florida's water quality standards are read in conjunction with this guidance (as well as Florida's entire surface-water scheme), we conclude that waterbodies not meeting water quality standards solely because of natural conditions need not be placed on Florida's impaired waters list. We therefore agree with the district court's holding that the EPA's approval of the delisting of the seven waterbodies was not arbitrary or capricious, and we affirm the entry of summary judgment on Sierra Club's third claim.

## VIII.

We affirm the denial of the FDEP's motion to intervene and the entry of summary judgment on Sierra Club's third claim. We reverse and vacate the entry of summary judgment on Sierra Club's first and second claims, and remand those claims for further proceedings consistent with this opinion. We deny the motions

34

of the EPA and the FDEP to strike.

AFFIRMED IN PART; REVERSED, VACATED, AND REMANDED IN PART.