[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13941
Non-Argument Calendar

_____

D.C. Docket No. 9:18-cv-80788-RAR

NYA YANITZA MONTANEZ,
as Personal Representative of the Estate of
Yanely Gonzalez, deceased,

Plaintiff - Appellant,

versus

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 28, 2020)

Before GRANT, LUCK, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Nya Yanitza Montanez appeals the district court's grant of summary judgment for Defendant Liberty Mutual Fire Insurance Company on her bad faith claim. The son of Defendant's insured caused an automobile accident involving two other cars and resulting in the death of Plaintiff's daughter and the injury of four other individuals. Although Defendant made the entire policy limits available to the various claimants, Plaintiff rebuffed Defendant's efforts to settle the case and instead proceeded with a lawsuit against Defendant's insured. She then obtained the agreement of Defendant's insured to a consent judgment in the amount of $8.25 million against the insured on the wrongful death claim made on behalf of her daughter. Thereafter, Plaintiff filed this bad faith claim against Defendant, contending that because Defendant had failed to timely settle the wrongful death claim, she is entitled to the damages awarded in the consent judgment, an amount that greatly exceeds the insured's policy limits. The district court granted Defendant summary judgment. The court concluded that Defendant diligently and promptly investigated the claims against its insured and that it did not act in bad faith by making the full policy limits available and scheduling a global settlement conference, rather than immediately tendering the per-person policy limit to settle Plaintiff's wrongful death claim. After careful review, we affirm the district court's grant of summary judgment.

## I.    BACKGROUND[1]

### A.    Factual Background

On January 30, 2010, Jason Brown was driving his father's vehicle in West Palm Beach, Florida, when he violently rear-ended Plaintiff's vehicle and spun into another car. The collisions injured five individuals riding in the two vehicles. Plaintiff was injured while driving her two minor children, three-month-old Yanely Gonzalez and eight-year-old Eduardo Gonzalez, Jr. Sadly, Yanely was killed. The impact of the collision caused Eduardo to be ejected from Plaintiff's vehicle, and he suffered head trauma. Brown's collision with the second vehicle injured thirty-eight-year-old Jose Ramos and two-year-old Maria Carmona. In short, the accident resulted in five victims, each with claims against Jason (the driver) and his father (the owner of the vehicle).

Jason's father, Douglas Brown, had a Liberty Mutual automobile insurance policy, which provided liability limits of $250,000 per person and $500,000 per accident. Douglas Brown reported his son's accident to Defendant on February 1, 2010, informing them that a child had been killed. The district court's order sets forth a description of Defendant's investigation and pre-litigation communications. We summarize those facts here.

---

[1]  Because we are evaluating Plaintiff's claim on summary judgment, we set forth the facts in the light most favorable to Plaintiff.

Defendant assigned a claims adjuster, Colleen Edwards (hereinafter, "the claims adjuster") to the case and sent "other insurance" affidavits and excess exposure letters to the insureds. The claims adjuster requested a police report and ran an internet search, which revealed that, in addition to the fatality of the infant, the accident had left four other people injured seriously enough to be sent to the hospital.

On February 2, 2010, after obtaining an "events report" from the Palm Beach County Sheriff, the claims adjuster contacted Douglas Brown and advised him that it would be in his best interest to retain counsel. The claims adjuster also learned that Jason Brown was not listed on the policy as an additional driver. This omission created a potential coverage issue requiring an investigation, and it prompted the adjuster to send reservation of rights letters to the insureds.

The claims adjuster initiated the coverage investigation, and on February 11, 2010, she forwarded this matter to Defendant's home office for its review and legal opinion. Defendant's coverage investigation included asking the sales department the specific questions that the sales agent had posed to the insured (such as the garaging of the vehicle in question, his household members, and any listed drivers) and whether the insured had made any misrepresentations during that process, as well as determining the extent to which this information might have affected the underwriting of the policy.

4

Meanwhile, on February 5, 2010, the claims adjuster spoke to Progressive Insurance, which was the Personal Injury Protection ("PIP") carrier for Plaintiff, and learned, for the first time, that Plaintiff had retained Toral, Garcia & Franz as counsel. That same day, the adjuster telephoned Mr. Toral's office, but was advised that she would need to call back later. Over the next few weeks, the adjuster tried four more times to reach Plaintiff's counsel by telephone, often leaving a message requesting him to call her back: all to no avail. Plaintiff's counsel never responded, and indeed did not provide the adjuster with any confirmation that he was even representing Plaintiff.

During this same time period, the claims adjuster investigated the claims of the injured victims in the other car—Ramos and Carmona—both of whom were suffering from neck and back injuries as a result of the accident. Unlike Plaintiff's counsel, counsel for Ramos and Carmona assisted the adjuster's investigation of their clients' claims, providing information about claimants' medical condition, among other things.

Defendant completed its coverage investigation on March 3, 2010, concluding that coverage would be afforded to the insured. It was now a month since the accident, but Plaintiff's counsel had still failed to contact Defendant or respond to the latter's requests to talk. Plaintiff's Progressive PIP adjuster, however, had informed Defendant that Plaintiff had sustained "serious injuries,"

5

including a fractured pelvis and fractured hip bones.  The PIP adjuster similarly informed Defendant that Eduardo Gonzalez Jr. had also sustained "serious injuries," including a head injury, after being ejected from the vehicle.  Defendant had learned from counsel for Ramos and Carmona that they were still undergoing treatment for neck and back pain, but no medical records or bills had been provided by them.

Despite not receiving any communication from Plaintiff and not receiving any medical records or bills for any of the four claimants undergoing medical treatment, Defendant sent a letter to counsel for all claimants on March 4, 2010, stating that it was making its full $250,000 per-person and $500,000 per-accident policy limits available to settle the claims arising from the accident.  Defendant stated that it would be arranging a settlement conference to assist all claimants in reaching an apportioned settlement.[2]

Finally, on March 5, 2010, Lewis Jack, called the claims adjuster and stated that he and Toral represented Plaintiff.  This was the first communication to Defendant from anyone on behalf of Plaintiff.

Nearly four weeks later, on March 31, 2010, Plaintiff's counsel sent its first correspondence to Defendant regarding Plaintiff's claims.  In that letter, Plaintiff

---

[2]  On March 17, Defendant sent a letter to claimants' counsel, advising them that the settlement conference had been scheduled for a date cleared with their respective offices, i.e., April 8, 2010. That conference never occurred.

preemptively rejected any offer by Defendant to settle Plaintiff's wrongful death claim, stating that Defendant should have immediately tendered the $250,000 policy limit instead of attempting to resolve the claims of all the victims at a settlement conference. Notably, Plaintiff never made a demand to settle the wrongful death claim for the $250,000 per-person policy limits. As for the personal injury claims, Plaintiff's letter requested that Liberty Mutual tender $125,000 for Plaintiff's personal injury claims and $125,000 for Eduardo Gonzalez Jr.'s personal injury claims.

Defendant responded on April 6, 2020, accepting Plaintiff's offer and issuing two $125,000 checks to settle Plaintiff's and Eduardo Gonzalez Jr.'s personal injury claims. Defendant also offered the remaining available policy limit of $250,000 to settle the wrongful death claim brought on behalf of the infant killed in the accident, later forwarding a check to Plaintiff's counsel.

Rather than settle, Plaintiff and Eduardo Gonzalez Jr. filed suit against the insureds, raising their personal injury claims and the wrongful death claim, among others. All claims except the wrongful death claim were eventually settled. As noted, with the cooperation of the insured, Plaintiff had obtained a $8.25 million consent judgment against the insured on the wrongful death claim.

## B.     Procedural History

On June 15, 2018, Plaintiff filed this lawsuit as the personal representative of the estate of Yanely Gonzalez, alleging one count of common law bad faith against Defendant.  As reflected in the amended complaint, Plaintiff maintains that Defendant breached its duties of good faith to its insured by failing to timely tender the $250,000 bodily injury liability limit to settle the wrongful death claim and protect its insured from an excess judgment.[3]  Plaintiff seeks damages, including the final judgment amount against the insured of $8,250,000.

Defendant moved for summary judgment, maintaining that it acted in good faith as a matter of law.  Defendant argued that within one month of being notified of the accident, it had offered its full policy limits to be apportioned at a global settlement conference.  Defendant noted it had done so despite the need for  an investigation of five bodily injury claims in two different vehicles, potential misrepresentation by the insureds that may have voided coverage, and the lack of any communication from Plaintiff.  Plaintiff responded that Defendant was fully aware that Yanely Gonzalez died in the accident, that the exposure from the wrongful death far exceeded other potential claims, and that consequently

---

[3]  A bad faith claim against an insurance company for failing to timely settle a claim brought against its insured—and thereby subjecting the insured to damages in excess of the policy limits—is a claim that belongs to the insured.  But as explained *infra*, a bad faith action may be brought by an injured claimant directly against a tortfeasor's insurer when third-party insurance claims are involved.

Defendant should have immediately tendered the $250,000 per-person limit based on the wrongful death claim, without being asked to do so by Plaintiff.

After reviewing the evidence in the light most favorable to Plaintiff, the district court, determined, as a matter of law, that no reasonable juror could infer that Defendant had acted in bad faith. The court concluded that, to the contrary, the evidence demonstrates that no reasonable jury could find that Defendant failed to act with appropriate care and diligence or that the 32-day period between Defendant learning of the accident and its tender of the full policy limits to be apportioned at a global settlement conference was unreasonable. Accordingly, the district court granted Defendant's motion for summary judgment and entered judgment in favor of Defendant. Plaintiff appeals that judgment.

## II.    DISCUSSION

Plaintiff appeals the district court's grant of summary judgment to Defendant. She contends that when the evidence is viewed in the light most favorable to her as the non-moving party, a reasonable jury could have concluded that Defendant acted in bad faith in handling the claims against its insured. We disagree with Plaintiff and conclude that the district court properly granted Defendant summary judgment.

## A.　　Standard of Review

"We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court." *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015), quoting *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007). "We thus view the evidence in the light most favorable to the non-moving party and will affirm only if the movant shows that no genuine issues of material fact exist." *Id.*, citing *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1161–62 (11th Cir. 2006).

## B.　　The District Court Properly Granted Summary Judgment

### 1.　　Bad Faith Actions Under Florida Law[4]

Florida law provides that "an insurer owes a duty of good faith to its insured." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004); *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (per curiam). The insurer's duty of good faith "obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid [the] same." *Gutierrez*, 386 So. 2d at 785. The duty also requires the insurer to "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible,

---

[4] "In diversity cases, we are required to apply the substantive law of the forum state; here, Florida." *Mesa*, 799 F.3d at 1358.

where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* When an insurer breaches its duty a cause of action for bad faith may be brought against the insurer. *Id*; Fla. Stat. § 624.155. Moreover, "[b]ad faith actions may be brought by a claimant directly against a tortfeasor's insurer when third-party insurance claims are involved." *Mesa*, 799 F.3d at 1358, citing *Thompson v. Commercial Union Ins. Co.*, 250 So. 2d 259, 264 (Fla. 1971) (holding that "a judgment creditor may maintain suit directly against tortfeasor's liability insurer for recovery of the judgment in excess of the policy limits, based upon the alleged . . . bad faith of the insurer in the conduct or handling of the suit").

To fulfill its duty in handling claims against its insured, an insurer must exercise "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* at 1359, quoting *Gutierrez*, 386 So. 2d at 785. "The insurer must therefore make 'decisions in good faith and with due regard for the interests of [its] insured.'" *Id.*, quoting *Gutierrez*, 386 So. 2d at 785. An insurer breaches its duty when it acts in bad faith—mere negligence is not enough. *Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974) ("[W]e align[ ] Florida with those states whose standards for determining liability in an excess judgment case is bad faith rather than negligence."). Under Florida law, "the question of whether an insurer has acted in

11

bad faith in handling claims against the insured is determined under the totality of the circumstances standard" and "is ordinarily for the jury to decide." *Mesa*, 799 F.3d at 1359, quoting *Berges*, 896 So. 2d at 680 (internal quotation marks omitted).

2.      No Reasonable Jury Could Find Defendant Acted in Bad Faith

In the present case, we conclude that a jury could not reasonably conclude that Defendant had acted in bad faith based on the evidence Plaintiff has proffered. *See Mesa*, 799 F.3d at 1358 (affirming summary judgment for defendant insurance company on a bad faith claim where insurance company was diligent in its efforts to settle multiple claims against its insured and there existed no causal connection between the insurer's actions and the entry of an excess judgment against its insured); *Gutierrez*, 386 So. 2d at 785–86 (holding insurer's motion for directed verdict should have been granted where insurer offered policy limits before trial and there was "no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer"). Upon notification of the accident, Defendant immediately opened a claim file and began an investigation. Through its own research, Defendant quickly determined that there were multiple victims not disclosed by the insured and that there were five total claimants. Defendant diligently investigated the claims arising from the occupants of the second vehicle, obtaining updates regarding the extent of their injury and their medical care. Defendant worked to do the same for Plaintiff and was able to

12

obtain limited information from Plaintiff's Personal Injury Protection carrier.

Defendant identified Plaintiff's counsel, initiated contact, and repeatedly attempted

to engage Plaintiff's counsel, all to no avail.  Consequently, Defendant remained in

the dark regarding Plaintiff's counsel's assessment of the personal injury claims of

Plaintiff and Eduardo Gonzalez Jr.  Given counsel's radio silence, Defendant also

lacked any knowledge whether Plaintiff would be willing to settle the wrongful

death claim for $250,000.[5]

Simultaneously, Defendant conducted an internal coverage investigation to

determine whether the policy covered the insured's son, who was not listed on the

policy and who was driving the vehicle in Florida, a location far removed from

Delaware, the state in which the policy was issued to the Browns.  Plaintiff

concedes that this investigation was warranted and Plaintiff offers no evidence

supporting the notion that Defendant delayed its investigation in bad faith.[6]

---

[5]  The district court perceived improper motives in Plaintiff's counsel's lack of communication, stating that "the Court cannot ignore Plaintiff's counsel's hand in manufacturing the delay Plaintiff now complains about" and asserting that "[t]he Court will not tolerate the use of bad faith claims as a sword for claimants in insurance litigation."  We agree with Plaintiff that the perceived desire of Plaintiff's counsel to manufacture delay is not, on its own, a ground for deciding whether the insurer acted in bad faith.  *See Berges*, 896 So. 2d at 677 ("[T]he focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured.").  Nonetheless, regardless of whether Plaintiff's counsel acted in good or bad faith, the fact remains that, given counsel's unresponsiveness, Defendant lacked claims information from Plaintiff as well as any insight into whether Plaintiff would have settled for $250,000.  Thus, this case is markedly different from *Berges*, where plaintiff communicated a settlement offer and imposed a deadline that went unheeded by the insurer.  *Id*.

[6]  Plaintiff contends that Defendant determined early on that the policy provided coverage.  The record reflects that an "initial" coverage investigation concluded that "Insured's son was a permissive user of the vehicle."  The initial investigation did not determine whether there had

13

Upon completion of the coverage investigation, and within 32 days of being notified of the accident, Defendant offered the full policy limits in furtherance of a global settlement of the multiple claims.  *See Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555, 560–61 (Fla. 4th Dist. Ct. App. 2003) (per curiam) (noting that an insurer's duty of good faith requires that it attempt to resolve as many claims as possible when there exist multiple bodily injury claimants and insufficient coverage under the policy).

Despite the fact that Plaintiff never even attempted to communicate with Defendant—much less make a settlement demand—before Defendant made the full policy limits available, Plaintiff contends that Defendant should have immediately tendered the $250,000 policy limit for the wrongful death claim.  But "because there were multiple claimants, [Defendant's] decision to pursue a global settlement was consistent with its duty of good faith under Florida law."  *Mesa*, 799 F.3d at 1360 (affirming summary judgment of no bad faith for failure to immediately tender policy limits for a catastrophic injury); *see Farinas*, 850 So. 2d

---

been any misrepresentations made during the application process regarding location and use of the vehicle that could void coverage.  Conducting that investigation was not unreasonable given that Jason Brown, the insured's son, was not listed on the policy and Jason was living in Florida, where the accident occurred, not in Delaware where the policy had been issued.  Even if the coverage investigation could have been completed sooner, we see no delay that a jury could reasonably conclude as rising to the level of bad faith, especially given the simultaneous need for Defendant to investigate multiple claims, the lack of communication from Plaintiff, no evidence suggesting a particular need for urgent action, and no indication that Plaintiff would settle the wrongful death claim for $250,000 or object to an allocated settlement conference.

14

at 560; *see also Shuster v. S. Broward Hosp. Dist. Physicians' Prof'l Liab. Ins. Trust*, 591 So. 2d 174, 177 (Fla. 1992) (noting that when multiple claimants exist, an insurer has a duty to abstain from "indiscriminately settl[ing] with one or more of the parties for the full policy limits"). Moreover, given the lack of communication from Plaintiff, we see no evidence in the record suggesting that Defendant knew it was exposing its insured to excess liability by failing to immediately tender the full policy limits for the wrongful death claim and by proposing a global settlement conference 32 days after first learning of the accident and before receiving any of the medical records that it repeatedly sought during that period. *See Mesa*, 799 F.3d at 1360 (noting "it is not unusual for settlement negotiations to last several months").

Viewing the facts in the light most favorable to Plaintiff, and considering the totality of the circumstances, we see no evidence indicating Defendant unreasonably exposed its insured to a judgment in excess of his policy limits. Accordingly, no reasonable jury could find that Defendant acted in bad faith.

## III.    CONCLUSION

For the reasons explained above, we **AFFIRM** the district court's grant of summary judgment to Defendant.